JONES v. COMMISSIONERS.

(Filed May 3, 1904).

1. VENUE—*At Chambers—At Term—Summons—Waiver—Exceptions and Objections.*

   An objection that the summons was made returnable at chambers instead of at term is waived by failure to move to transfer the case to the proper docket.

2. VENUE—*Summons—At Chambers.*

   Where a summons is improperly made returnable at chambers, it should not be dismissed, but transferred to the proper docket.

3. MANDAMUS—*Bonds—Counties—County Commissioners.*

   A mandamus is the proper remedy to compel county commissioners to issue bonds ordered by the general assembly.

JONES *v.* COMMISSIONERS.

4. *MANDAMUS—Bonds—Counties—County Commissioners—Acts 1903,*
   *ch. 289.*

   An act "authorizing and empowering" county commissioners to issue
      bonds is not mandatory.

CONNOR and MONTGOMERY, JJ., dissenting.

ACTION by W. W. Jones against the Commissioners of
Madison County, heard by *Judge E. B. Jones,* at Chambers,
Asheville, N. C., October 21, 1903.

The plaintiff, as receiver of the Western Carolina Bank,
is the owner of eighteen coupon bonds of Madison County,
aggregating $21,000, issued by the county of Madison by
virtue of an act of the General Assembly of North Carolina,
entitled "An act to settle the indebtedness of Madison
County," ratified March 7, 1887, chapter 398, Laws 1887.
They were issued to pay the necessary expenses of said
county. The interest upon said bonds is payable as stated
therein, and they mature and become due in the year 1907.
In addition to said bonds the plaintiff is the owner of a cer-
tain warrant of indebtedness duly issued by said county for
the sum of $5,155.16, which represents interest due and
unpaid upon said bonds up to and including June 1, 1901,
but upon this warrant of obligation there are certain credits,
as stated in the findings of fact embraced in the judgment
of his Honor. There is likewise interest due and owing to
the plaintiff upon the coupons yet attached to said bonds and
upon said warrant, as stated in said judgment and findings
of fact of the Court below.

Under Public Laws, 1903, chapter 283, entitled, "An
act to liquidate and settle the outstanding indebtedness of
Madison County and to authorize the issue of a series of
bonds for the purpose of paying off the bonds, floating debts
and other claims now outstanding against the county of
Madison, contracted for the necessary expenses of said

county," it is claimed by the plaintiff that it became the duty of the defendants, the Board of Commissioners of Madison County, to issue certain bonds not to exceed the amount of $75,000, with which, or the proceeds of which, to refund and pay off and discharge said bonds and certain other indebtedness of the county of Madison therein mentioned.

The plaintiff, and those under whom he derived his title to said bonds and other indebtedness against the county of Madison at various times demanded of the Board of Commissioners of Madison County that they issue said bonds as provided by said Act of 1903 ; and at a meeting of said board held April 20, 1903, it was resolved by the same that said bonds be issued to an amount sufficient to pay off said indebtedness of said county, not to exceed $75,000; but at a subsequent meeting of said board held on or about the first Monday in May, 1903, the said board revoked its order of April 20, 1903, and then refused, has since refused and still refuses to issue said bonds; whereupon the plaintiff again made demand upon said board that they issue said bonds and in all things comply with the provisions of said Act of 1903. Said board again refused to issue said bonds for the reasons stated in their exceptions filed to the judgment; whereupon this proceeding was instituted by the plaintiff against the defendants for the purpose of compelling them, by *mandamus,* to issue said bonds and in other respects comply with the provisions of said Act of 1903. Upon the hearing of this case before his Honor the Judge of the Superior Court, it was adjudged that the plaintiff was entitled to the relief demanded in his complaint. The defendants duly excepted to said judgment and appealed.

*Charles E. Jones* and *Davidson, Bourne & Parker,* for the plaintiff.

*T. S. Rollins* and *Gudger & McElroy,* for the defendants.

CLARK, C. J.  The first exception is that the summons was returnable before the Judge at chambers, when the action being for a money demand should have been returnable before the Court at term.  But if that be conceded, yet, as held in *Ewbank v. Turner,* 134 N. C., 77, whether an action is returnable before the Judge at chambers or at term or before the Clerk, it is all before the same Court, and if brought before the wrong department the remedy is the same as when action is brought in the wrong county.  There is no defect of jurisdiction but an error as to venue merely, and the remedy is for the Court, either *ex mero motu* or on motion, to transfer the case to the proper docket.  The defendant, not having made such motion, has waived his objection.  Here the summons is returnable at chambers, but on a day during the term of court.  Authorizing an action to be brought before the Judge at chambers is simply intended as a convenient practice in cases where no jury is required in order to expedite a decision.  If it turns out that there are issues of fact requiring a jury, there is nothing to be gained to any one by dismissing the action.  It should simply be transferred to the docket at term time for trial.  It would seem, moreover, that this action was properly made returnable at chambers.  The amount is determined, and it is not sought to recover judgment therefor.  The relief asked is a *mandamus,* not against the treasurer to pay any money, but to compel the County Commissioners to issue bonds.  *Ducker v. Venable,* 126 N. C., 447; *Railroad v. Jenkins,* 68 N. C., 503.

A better founded exception is that the act, Laws 1903, chapter 289, is not mandatory.  The preamble recites that the county has an outstanding bonded indebtedness of $21,000 bearing six per cent. interest, and the county will be unable to pay the same at maturity, and that it is to the best interest of the tax payers that the bonds shall be renewed before maturity at a lower rate of interest, and also that the floating

indebtedness of the county, incurred for necessary expenses, should be funded by issuing a new series of bonds to cover the entire indebtedness of the county, and it is thereupon provided by section 1 that the Board of Commissioners are "authorized and empowered" to issue not exceeding $75,000 in bonds bearing five per cent. interest. Section 3 "authorizes the commissioners to lay an annual special tax to meet the interest and principal. By section 8 the County Commissioners are "authorized, empowered and directed" to audit and ascertain and adjust the amount of the floating debt, and no bonds to be issued for any part of said debt unless two (of the three) commissioners shall pass upon and allow the same. Section 10 "authorizes" the County Commissioners to retire the outstanding bonds by selling so many of the bonds issued under this act as may be necessary. Section 19 provides, *"If the bonds authorized by this act are issued,"* the Board of County Commissioners shall levy a sufficient tax to pay the principal and interest, as already stated in section 3.

It would be a singular proceeding, and without precedent, we believe, in this State, if the Legislature should assume to know the wishes and interests of the people of any county better than the County Commissioners elected by them to administer county business, and should peremptorily command the commissioners to issue bonds to fund a floating indebtedness, and in advance of the maturity of the bonded debt should order it refunded by new bonds for a time and at a rate fixed by the General Assembly. The long-settled custom has been to authorize and empower the local legislature, the Board of County Commissioners, to take such steps as may be necessary to fund or refund the debts, with certain limitations upon the rate of interest and duration of the bonds to be issued. Certainly, if the Legislature can order a county to issue bonds, it could as easily fix the interest at

one figure as another. If the Legislature had this power, a casual majority could practically confiscate all property in any county by directing the issue, by counties named in the respective acts, of large amounts of bonds and at an excessively high rate of interest, regardless of the wishes of the tax payers of such county. Unlike State bonds issued by legislative authority, action could be brought in the courts on county bonds thus required to be issued by legislative authority and payment coerced. The assumption of a power so unprecedented, so contrary to the spirit of local self-government, and so liable to abuse, should be carefully scrutinized by the courts. We are relieved, however, in this case of the necessity of passing upon the power of the General Assembly to compel a county to issue bonds against its will, for it will be seen from the above extracts from the statute that the Legislature clearly intended no more than to authorize and empower the County Commissioners to issue "not exceeding seventy-five thousand dollars." It is for the courts, not the General Assembly, to order the payment of debts, whether by counties or individuals. The courts certainly could not compel the issuance of these bonds unless the Legislature has both ordered the county peremptorily to issue the bonds and had authority so to do.

In *Tate v. Comrs.*, 122 N. C., 812, the Court, speaking of counties, says: "They are but agencies of the State government. * * * They are subject to legislative authority which can direct them to do as a duty all such duties as they can empower them to do." The Court was there speaking of counties in respect to their governmental functions, as to which the counties are merely agencies of the State government and can be abolished, created or changed at the legislative will. The making of public roads is a public governmental function, and it was held that the Legislature could either empower or order the making of these roads,

in which the people of the State generally have an interest, and direct that the county shall lay a tax to pay for the construction of the road. But so far as the counties are business agencies of the people of a locality, whether county or municipality, the State cannot interfere to make them create a debt or contract, or extend it (as here), or change the terms of the contract or authorize its violation. This distinction in the double function of counties and municipalities as governmental agencies on the one hand, in respect to which they cannot be sued and as to which they are subject to legislative control, and on the other hand their liability as business agencies of the people of the locality, as to which hence they can be sued and the Legislature has no power to control nor to create or relieve from liability, has been drawn in many cases. See *McIlhenny v. Wilmington,* 127 N. C., 146, 50 L. R. A., 470, and cases there cited. The Constitution, Article V, section 6, uses the words "with the special approval of the General Assembly," and not "by special command of the General Assembly."

The plaintiff relies upon an expression in section 11 of chapter 289, Laws 1903, that if any creditor shall desire to exchange his bonds or other evidence of indebtedness "for one or more of the bonds *hereby authorized,*" it shall be the duty of the commissioners to make such exchange at par. But construed with the context, this means no more than the expression in section 19 of the act, "If the bonds authorized by this act are issued" the Board of Commissioners shall levy a tax, etc.

If the General Assembly has power to order a county to issue bonds, those acquainted with practical legislation and "senatorial courtesy" know that this important power will be in effect placed in the hands solely of those who for the moment represent the county in the General Assembly, and at a time when they will have small opportunity to consult

the wishes and interests of their constituents, and when, on the other hand, the agents and attorneys of those who desire to receive the bonds will be not only present in person but very ready with their arguments and advice.    It is true the Legislature can abolish counties at will (*Mills v. Williams,* 33 N. C., 558), and repeal municipal charters, so far as counties and municipalities are governmental agencies, but so far as they are business agencies of the people of the locality to create indebtedness the Legislature cannot impair the obligation of the contract.    Can the Legislature then compel the creation of a contract by a county by ordering the issue of bonds for thirty years, when the people thereof may prefer a shorter or longer term, and may be able to secure a lower rate of interest.    Whether the Legislature has the constitutional power to take such a departure from precedent and can itself order the issuance of bonds, instead of authorizing and empowering the County Commissioners to do so (subject to the restraining power of the Court if an excessive amount or an excessive interest is contemplated, a restraint which would not attach to an issue made by legislative command), is happily a matter not before us, for the General Assembly in this statute has explicitly and clearly, and in the usual form, merely authorized and empowered the Board of County Commissioners to issue "not exceeding $75,000" to fund the floating indebtedness (the amount thereof to be ascertained by the commissioners) and to refund the bonded indebtedness which will mature in 1907. The General Assembly has not attempted to force the hands of the defendant Board of County Commissioners.    It is true that the County Commissioners, at a called session of April 20, being advised by counsel that the act was mandatory and that they had no discretion, did resolve to issue said bonds, but no action was taken thereon which conferred upon the creditors any vested rights, and at the first regular

135——15

meeting immediately thereafter on the first Monday in May, the board being then of opinion that the act merely "authorized and empowered" them to issue bonds, the order was revoked for reasons which they must have deemed good and sufficient, but which are unknown to us. The *mandamus* was improvidently granted.

Reversed.

WALKER, J. I concur in the conclusion of the Court in this case for the reasons stated in my opinion in *Bank v. Comrs.*, 135 N. C., 230.

CONNOR, J., dissenting. The only respect in which this case differs from *Bank v. Comrs.*, in which I have expressed my views, is that the plaintiff's claim consists of certain bonds, with the coupons representing accrued and past-due interest thereon, issued by the defendants pursuant to the provisions of the Act of 1887 and maturing 1907. It is recited in the preamble to the Act of 1903, and admitted in the record, that these bonds were issued for an indebtedness incurred for necessary expenses. The liability of the county of Madison for them because of the consideration is settled by this Court in *Smathers v. Comrs.*, 125 N. C., 480. It is contended that the Act of 1903 is invalid in so far as it directs the issuance of new bonds to run thirty years, carrying interest at five per cent., to redeem unmatured bonds. If I am correct in the conclusion reached in respect to the power of the General Assembly to direct the payment of county indebtedness incurred for *necessary expenses,* I cannot perceive why, if in its judgment the best interest of the State, in respect to that portion thereof set off for governmental purposes as Madison County, will be promoted by funding its debt, rapidly approaching maturity, and for which it is evident no other provision has been made at a lower rate of interest, it may not so direct. In the establishment

of the county, as pointed out by *Pearson, C. J.,* in *Mills v. Williams,* 33 N. C., 558, there is no contract—"no party of the second part." I do not care to repeat what I have said in *Bank v. Comrs.* The distinction between contracts of private persons or corporations and public agencies is clearly pointed out in *Railroad Co. v. Nebraska,* 175 U. S., 57. On Page 72 *Mr. Justice Shiras* says: "Usually where a contract not contrary to public policy has been entered into between parties competent to contract, it is not within the power of either party to withdraw from its terms without the consent of the other; and the obligation of such a contract is constitutionally protected from hostile legislation. When, however, the respective parties are not private persons dealing with matters and things with which the public has no concern, but are persons or corporations whose rights and powers were created for public purposes by legislative acts, and when the subject-matter of the contract is one which affects the safety and welfare of the public, other principles apply. Contracts of the latter description are held to be within the supervising power and control of the Legislature when exercised to protect the public safety, health and morals. That clause of the Federal Constitution which protects contracts from legislative action cannot in every case be successfully invoked." See also, *Williams v. Eggleston,* 170 U. S., 304. In *New Orleans v. Water Co.,* 142 U. S., 79, it is said that a corporation created for purposes of government is to be governed according to the law of the land, and may be controlled, its constitution altered and amended by the government in such manner as the public interests may require. "Such legislative interference cannot be said to impair the contract by which the corporation was formed, because there is in reality but one party to it, the trustees or governors of the corporation being merely the trustees for the public, the *cestuis que trust* of the founda-

tion." Mr. Tucker, discussing this question, says: "These charters are based upon no contract with the people, but created by the political authority for its convenience and for motives of public policy. The relation between the sovereignty and the municipality is not contractual, but is one of delegation by a principal to an agent." Tucker Com. on Const., 833. For a very able discussion of this subject, see *Sharswood, J., in Philadelphia v. Fox,* 64 Pa. St., 169. When therefore the State established Madison County with its territorial limit, and conferred upon the inhabitants certain governmental powers, and imposed corresponding duties, it in no manner parted with its rights through the Legislature to exercise that constitutional governmental dominion and control which is essential to the carrying out of its general policy. It could not abrogate or ever put in abeyance this power, or the exercise of it, without to that extent parting with its sovereignty. This the State never can do in respect to any of its political agencies. They are always subject to legislative control. *Mial v. Ellington,* 134 N. C., 131. If the contention of the defendant is correct, and the State occupies the status towards the county which is contended for, it would be difficult to justify the appropriation of money from the public treasury to counties for the aid and support of public schools, the sending at the charge of the people of the State of convicts into counties for opening highways and other internal improvements. If each county may assert its own will in respect to assuming the burdens and providing for the costs imposed upon it as an integral part of the State by the General Assembly—as for instance, making provision for holding the courts at the appointed times, or having a jail, or providing or maintaining a home for the poor—it would be impossible to carry on our governmental system, the wisdom of which has been vindicated by long experience. As is said by *Merrimon, J., in White v.*

*Comrs.,* 90 N. C., 437, 47 Am. Rep., 534: "The leading
and principal purpose in establishing them is to effectuate
the political organization and civil administration of the
State in respect to its general purposes and policy which
requires local direction, supervision and control, such as mat-
ters of local finance, education, provision for the poor, the
establishment and maintenance of highways and bridges, and,
in a large measure, the administration of justice. They con-
stitute a distinguishing feature in our free system of govern-
ment." They have been termed "an involuntary civil divis-
ion of the State created by statute to aid in the administra-
tion of the government."

An interesting and instructive discussion may be found in
Smith Modern Law of Municipal Corporations, section 1, 65.

The Legislature finding the condition of Madison County
in respect to its indebtedness such that some provision was
necessary to enable it to meet its past-due interest and the
approaching maturity of the principal, together with its float-
ing debt, enacted the statute of 1903. No injustice is done
the tax payers of the county. The interest at six per cent.
on the bonds is overdue and compounding. The credit of
the county must soon be seriously impaired. The course
pursued is that which all prudent business men, corporations
and governments adopt. The debt is funded at a lower rate
of interest by a bond issue extending through the usual period
for such bonds. An examination of our statutes for the past
ten years will show that the rate of interest and time fixed
for maturity are the same as that of a large majority of the
county bond issues authorized. The acts passed at the ses-
sion of 1903 providing bond issues for other counties are
of the same character in these two respects, and include sev-
eral of the wealthiest counties in the State. The creditors
of course cannot be compelled to surrender a six per cent.
bond maturing in 1907 for a five per cent. bond running

thirty years, but as they elect to do so it is difficult to see how any injustice is done the tax payers. It will be observed that the treasurer is not permitted to sell the bonds at less than par, and while the election is given the creditor to take the new bonds in exchange for the old ones, I cannot see why, if the bonds can be sold at more than par, he can complain if his bond be paid him in cash. I think that the judgment below should be affirmed.

I have not discussed the question presented in the record and briefs that the commissioners, having met and adopted a resolution directing the bonds to be issued, have no power to rescind this action, that the power in the nature of a trust once exercised was extinct. This view is not advanced as an estoppel. While from the view which I take of the case it is not necessary to decide the question, there is in my opinion much force in it.

MONTGOMERY, J., concurs in the dissenting opinion.