BANK v. COMMISSIONERS.

(Filed May 3, 1904).

For headnotes to this case, see *Jones v. Commissioners,* 135 N. C., 218.

ACTION by the Battery Park Bank against the Board of Commissioners of Madison County and others, heard by *Judge E. B. Jones,* at chambers, Asheville, N. C., November 20, 1903. From a judgment for the plaintiff the defendants appealed.

*Frank Carter* and *H. C. Chedester,* for the plaintiff.
*T. S. Rollins* and *Gudger & McElroy,* for the defendants.

BANK v. COMMISSIONERS.

CLARK, C. J.    The facts in this case are substantially the same as in *Jones v. Comrs.*, 135 N. C., 218, the only difference being that the plaintiff here alleges that he holds $722 of the scrip issued by the county for necessary expenses and for which he wishes county bonds, and in *Jones v. Comrs.* the plaintiff held bonds which are not yet due but which he wished refunded in new bonds. Whatever distinction this may make in the rights of the plaintiff, if any, our decision in *Jones v. Comrs.* is not based upon such difference, but upon the fact that chapter 289, Laws 1903, is not mandatory, and places the issuance of bonds in the discretion of the Board of County Commissioners, who are merely "authorized and empowered" to make such issue.

For the reasons given in that case the judgment herein, which peremptorily orders bonds issued to the plaintiff, is likewise

Reversed.

CONNOR, J., dissenting. This is a controversy submitted without action under section 567 of The Code upon an agreed state of facts. The plaintiff is a corporation. The county of Madison is indebted to divers and sundry persons, including the plaintiff, in a sum aggregating $70,000 or thereabouts, as nearly as the parties can ascertain; said indebtedness consisting (1) of bonds of said county issued under and by virtue of chapter 398, Public Laws 1887, and not yet due, amounting to $25,000 or thereabouts; and (2) of the present floating debt of said county incurred for the necessary expenses thereof prior to January 1, 1903, all of which is past due and bears interest at the rate of six per cent. per annum, amounting to about $45,000—this last-named item including an indebtedness to the plaintiff of $722.93, as nearly as the parties can ascertain, of which sum $500 is principal and bears interest from the date thereof until paid, at the rate

of six per cent. per annum. (3) That the aforesaid debt and claim of the plaintiff against said county has been duly presented to and passed upon by the special board of audit created by section 7, chapter 289, Public Laws 1903, and by said board has been duly proved, declared and reported to be a valid subsisting obligation of said county and to be past due, and to have been contracted for the necessary expenses of said county prior to January 1, 1903. (4) That the General Assembly of North Carolina at its session of 1903 passed an act entitled "An act to liquidate and settle the outstanding indebtedness of Madison County, and to authorize the issue of a series of bonds for the purpose of paying off the floating debt, old bonds, etc., contracted for the necessary expenses of said county." (5) That at a special session held on April 20, 1903, the defendant Board of Commissioners made the following order, as the same appears on the minutes of said board: "Whereas the General Assembly of North Carolina for the year 1903 passed an act authorizing the Board of Commissioners of Madison County to issue bonds in an amount not exceeding $75,000 to pay off all the debt of said county contracted prior to the first day of January, 1903, for the necessary expenses of said county: Therefore be it resolved by the board that this county issue its bonds to an amount sufficient to pay off the said debt, not to exceed $75,000, and to issue the amount audited as found by the auditing board. It is further ordered that notice be issued to all creditors of said county to present their claims for audit before said board of audit, authorized by said act, on the 28th day of May, 1903, so that the same may be passed upon as required by said act; thirty days' notice to be given of the time and place of meeting of said board of audit." (6) That thereafter, to-wit, at their regular meeting in May, 1903, the said defendant Board of Commissioners made the following order, as the same appears on

the minutes of said board: "Ordered by the board that the order made at its called session of April 20, 1903, authorizing the issue of bonds, be and the same is hereby revoked; and it is further ordered that no bonds be issued under the recent bonding act passed by the last Legislature relative to Madison County." (7) That the plaintiff has demanded of the defendants that they issue the bonds authorized by the above-recited act of 1903, and place the same in the hands of the treasurer of said county, pursuant to the provisions of said act, which the said defendants have failed and refused to do.

The Court upon the foregoing state of facts ordered and adjudged that the defendant Board of Commissioners and W. L. George, chairman of said board, and V. B. Davis, Register of Deeds, execute and issue the bonds of said county authorized by the said act, in accordance with the terms and provisions of said Act of 1903, and that said bonds be delivered to the Treasurer of Madison County to be held and disposed of, and the proceeds thereof applied by him in the manner and for the purposes declared, defined and specified in the said act, and that a peremptory writ of *mandamus* be issued to that end. From this judgment the defendants appealed.

The preamble of chapter 290, Laws 1903, is as follows: "The General Assembly of North Carolina do enact: Whereas by an act of the General Assembly of North Carolina, Public Laws of 1887, chapter 398, hereinafter referred to, the Commissioners of Madison County were authorized to issue the bonds of the county not to exceed the sum of $25,000 bearing interest at six per cent. payable semi-annually, and in conformity with the said act the Board of Commissioners of Madison County issued the bonds of the said county, amounting in all to $21,000, with coupons attached; and whereas the said bonds are now an outstanding indebtedness against said county, and the said county will not be able

to pay the principal of the same at maturity; and whereas it is to the best interest of the tax payers of the said county that the said bonds shall be renewed, before their maturity, by refunding the same at a lower rate of interest than six per cent., and also that the present floating debt of the said county, incurred for the necessary expenses thereof prior to January 1, 1903, together with all accrued interest due at the date of payment or refunding, be liquidated and funded by issuing a new series of bonds to cover the same and to embrace the entire debt of said county incurred for the necessary expenses, as it existed on January 1, 1903, with the interest thereafter accruing." It is thereupon enacted that the Board of Commissioners "are hereby authorized and empowered to issue coupon bonds, etc.," that said bonds become payable on June 1, 1903, and to bear interest at the rate of five per cent., payable semi-annually, and that they be issued only to liquidate outstanding bonds and for the necessary expenses of said county incurred prior to January 1, 1903, with accumulated interest."

Provision is then made for the form of said bonds, and authority given to levy a special tax to pay the interest and principal when the same become due. By section 7 of said act a special board of audit it created to scrutinize, examine and adjust and report to the said board all bonds, claims and debts contracted by the said county prior to January 1, 1903, which are still outstanding, unsettled and unliquidated. Said board is required to report to the County Board of Commissioners all such claims, bonds, etc., as shall be audited and allowed by them. The findings of the board of audit are made conclusive in regard to the purpose for which the said bonds were issued or debt contracted. Section 9 of said act provides that immediately after its ratification, the chairman of the Board of Commissioners shall advertise in some newspaper published in the county of Madison, and

at the court-house door in said county, for thirty days, the
place and time when and where the said board of audit shall
sit, and require all persons holding debts against said county
incurred prior to January 1, 1903, to present the same before
said board of audit.   The Board of Commissioners are
authorized to retire all of the outstanding bonds issued under
chapter 398, Public Laws 1887, with the interest due thereon
at their par value, and pay off and discharge all of the out-
standing indebtedness of the said county incurred for the
necessary expenses thereof prior to January 1, 1903, as herein
provided, by selling so many of the bonds issued under this
act as may be necessary for such purpose, and by applying
the proceeds thereof to the liquidation of such bonds so
retired and of such debts.   Said bonds shall sell for not less
than their par value.   It is made the duty of the Board of
Commissioners to place the bonds, when issued, in the hands
of the treasurer of the county, whose duty it shall be to sell
the same and to place the proceeds as set out in the act.   It
is further provided that if any creditor of said county, whose
debts or claims come within the meaning of this act, or any
holder of any bonds of said county shall desire to exchange
his bonds, coupons or other evidence of said indebtedness,
it shall be the duty of said commissioners to pay off the said
creditors and liquidate the said indebtedness in the bonds
authorized by this act, exchanging said bonds at their par
value and cancelling the evidences of indebtedness taken in
lieu thereof.   All of the bonds issued under this act shall
be exempt from county and municipal taxation.   Provision
is then made for the special taxes provided for.   It is further
provided that if any officer of the county shall apply the
proceeds of any bonds issued under this act, or exchange any
such in any other manner or for any other purpose, or shall
issue any more of the bonds than shall be necessary for the
specific purposes of this act, or shall fail and refuse to per-

form the duties imposed upon him by the provisions of this act, he shall be guilty of a felony. By section 19 it is enacted that if the bonds are issued, the Board of Commissioners of the county shall not levy a specific tax, as authorized by section 8, chapter 322, Laws 1901, but shall levy a tax on property and polls to pay the interest ·on the bonds, etc.

After careful consideration and examination of this record and of the authorities cited by the counsel and my own investigation, I am constrained to differ from the majority of the Court in the conclusion reached by them. I would be content to express my dissent without saying more, but the reasoning upon which the judgment of the Court is based is so variant from my views, and, as I think, with all possible deference, from sound legal principles and authority, that it seems proper and becoming to set forth the result of my thoughts and investigation upon the very important questions involved. To my mind the principles underlying the decision of the case are of vital importance in the administration of our State and county government. My strong convictions upon the subject must be my excuse for encumbering the record with my dissent.

The questions presented by the record may be stated as follows:

1. Does chapter 289 of the Acts of 1903 impose upon the defendant Board of Commissioners the duty to issue the bonds and dispose of the proceeds, when sold, as directed by the terms of the statute?

2. If so, is it within the power of the Legislature to impose such duty and to make its performance mandatory?

3. Will the Court, by *mandamus,* compel the performance of such duty?

The plaintiff maintains that an affirmative answer should be given to each of these questions, and its claim for relief

is based upon this contention. That the questions may be considered free from complications, it will be well to keep in view the admitted and essential facts as they appear in the record. The indebtedness of Madison County, which is included in the provisions of the act, may for the purpose of this discussion be thus classified:

1. The bonds issued pursuant to the Act of 1887, maturing in 1907.

2. The accrued and past-due interest on said bonds.

3. The present floating debt incurred for the necessary expenses of said county prior to January 1, 1903, and past due.

The plaintiff's debt falls within the third class. It will be observed that by section 7 of the act a special board of audit is created, the members thereof named, and its duties prescribed. Neither the existence of this board nor its procedure is dependent upon any action of the defendant Board of Commissioners. On May 30, 1903, the special board, in strict compliance with the provisions of the statute, met and the plaintiff's claim, together with others, was "presented, proved and allowed." It was also ascertained and declared by the said board that the plaintiff's claim was "for the necessary expenses of the county incurred prior to January 1, 1903." The action of the board was duly reported to the defendant Board of Commissioners as prescribed by the act. Demand has been made by the plaintiff that the bonds be issued and other proceedings had as provided by the statute. Thus, we have fixed by admission of the defendant a valid indebtedness incurred for the necessary expenses of the county, etc.

Has the Legislature commanded the payment of this debt by the means prescribed by the statute, or has it left to the discretion of the commissioners the payment of the said debt in the manner directed? The defendant says that the lan-

guage of the statute is permissive, and not mandatory; that the words *"hereby authorized and empowered to issue the bonds,"* etc., exclude the idea that it was the purpose of the Legislature to impose any duty or to require the issuance of the bonds, unless in the exercise of their discretion the defendant commissioners see fit to do so.

The principle by which the courts have been guided in construing statutes containing the terms used by the Legislature or other terms of similar import, was first announced in *Rex v. Barlow*, 2 Salk., 609, which the case states was an "indictment on 14 Car. 2, chapter 12, against church wardens and overseers for not making a rate to reimburse the constables. Exception was taken that the statute only puts it in their power to do so by the word *may,* but does not require the doing of it as a duty, for the omission of which they are punishable. *Sed non allocatur,* for where a statute directs the doing of a thing for the sake of justice or the public good, the word *may* is the same as the word *shall;* thus 23 Hen. VI. says the sheriff may take bail; this is construed he *shall."* This case has been cited as authority and the principle announced uniformly approved.

In *King v. Inhabitants of Derby* (Skinner, 370) the report of the case is as follows: "Moved to quash the indictment against divers inhabitants in Derby for refusing to meet and make a rate upon the several parishes in Derby to pay the contables tax; first because they are not compellable, but the statute only says that they *may,* so they have their election, and no coercion shall be; *non allocatur,* for *may* in the case of a public officer is tantamount to *shall;* and if he does not do it he shall be punished upon an information; and though he may be commanded by a writ, this is but in aggravation of his contempt."

In *Regina v. Tithe Commissioners,* 14 Q. B., 459, *Mr. Justice Coleridge,* construing an act conferring power on

the defendants, says: "The words undoubtedly are only empowering, but it has been so often decided as to become an axiom that in public statutes words only directory, permissory or enabling may have a compulsory force when the thing to be done is for the public benefit or in advancement of public justice."

"Permissive words in respect of courts or officers are imperative in those cases in which the public or *individuals* have a right that the power so conferred be exercised. Such words, when used in a statute, will be construed as mandatory for the purpose of sustaining and enforcing rights, but not for the purpose of creating a right or determining its character; they are peremptory when used to clothe a public officer with power to do an act which ought to be done for the sake of justice, or which concerns the public interest or *the rights of third persons."* Southerland on Statutory Construction, 597.

The principle is thus stated in Endlich on Int. of Stats., section 311: "There is therefore abundant authority for the proposition that such powers as are here under consideration are invariably imperative; and that it is the duty of those to whom they are entrusted to exercise them whenever the occasion contemplated by the Legislature arises. And having regard to this implied duty, the enabling or *facultative* terms in which the power may be couched, much as 'it shall be lawful,' are to be regarded merely as the usual mode of giving a direction; as *importing* that it shall not be lawful to do otherwise than as directed."

*McCrary, Circuit Judge,* in *Ralston v. Crittenden,* 13 Fed. Rep., 508, thus states the rule of construction: "Even if the terms of a statute are permissive only, and mean no more than the words generally employed in statutes importing a grant of authority or power to a public officer to do a certain act, still it is well settled that all such acts are construed as

mandatory, whenever the public interests or *individual rights* call for the exercise of the power conferred."

In *Supervisors v. U. S.,* 17 Wall., 435, the language of the act was: *"May, if deemed advisable, levy a special tax, etc."* *Swayne, J.,* says: "The counsel for the respondent insists with zeal and ability that the authority thus given involves no duty; that it depends for its exercise wholly upon the judgment of the supervisors, and that judicial action cannot control the discretion with which the statute has clothed them. We cannot concur in this view of the subject." The Judge cites the English cases and concludes: "These are the earliest and the leading cases upon the subject. They have been followed in numerous English and American adjudications. The rule they lay down is the settled law of both countries. * * * The conclusion to be adduced from the authorities is that where power is given to public officers, in the language of the act before us or in equivalent language—whenever the public interests or individual rights call for its exercise—the language used, though permissive in form, is in fact peremptory. What they are empowered to do for a third person the law requires shall be done. The power is given, not for their benefit, but for his. It is placed with the depositary to meet the demand of right and to prevent a failure of justice. It is given as a remedy to those entitled to invoke its aid and who would otherwise be remediless. In all such cases it is held that the intent of a Legislature, which is the test, was not to devolve a mere discretion, but to impose 'a positive and absolute duty.' "

In *Galena v. Amy,* 72 U. S., 705, the charter provided that the city council *"may,* if the said city council *believe* that the public good and best interest of the city require, annually collect a tax, etc., for the payment of the funded debt of the city, etc.," and the Court said that "this power has not been exercised by the city authorities, and they have made no

other provision for liquidating the debts due to the relator. They have no other means of payment in possession or prospect.  *  *  *  The rights of the creditor and the ends of justice demand that it should be exercised in favor of affirmative action and the *law requires it.*  In such cases, the power is in the nature of a trust for his benefit, and it was the plain duty of the Court below to give him the remedy for which he asked, by awarding a peremptory writ to compel the imposition of the tax."

In *People v. Supervisors,* 51 N. Y., 401, the board of supervisors were "authorized and empowered" to hear and determine certain claims against the county and to provide for their payment. *Earle, J.,* says that "The first question to be determined is whether this act was merely permissive or mandatory to the board of supervisors.  *  *  *  This relief would be quite illusory if it were left to the absolute discretion of the board of supervisors of any county to refund the taxes or not, as they might see fit.  *  *  *  The purpose of the act, as well as the simplest justice, requires that we should hold that it is mandatory upon the respective boards of supervisors, unless there is something in the plain language used that forbids such a construction.  The words 'authorized and empowered' are usually words of permission merely, and generally have that sense when used in contracts and private affairs; but when used in statutes they are frequently mandatory and imperative."  After examining the cases, he says: "These authorities are abundant to show that the language used in the act under consideration must be construed to be imperative."

In *People v. Supervisors,* 68 N. Y., 114, the language of the statute was "that the said board *may in their discretion* cause the tax to be levied."  The same learned Justice, speaking of the right of the creditor, says: "He has rendered a service for the public for which he expects to be paid, and for

135——16

which he ought to be paid, either by the town or the county.
\* \* \* Under such circumstances· he goes to the Legisla-
ture, and it knowing, as we are bound to believe, the facts,
passes an act for his relief. The relief might be quite illus-
ory if it was intended to leave it to the debtors to say whether
they would pay or not. No act was necessary to enable the
supervisors to pay for this bridge if they were willing to.
\* \* \* Hence, it cannot be supposed that it was the inten-
tion of the Legislature simply to confer a permissive author-
ity to do what they could do without the act, if willing.
\* \* \* Here was something directed to be done for the
sake of justice, and in such a case the word 'may' is generally
construed to mean 'shall.' " See also, *Sifford v. Morrison,*
63 Md., 14.

*Smith, C. J.,* in *Johnston v. Pate,* 95 N. C., 68, says:
"The term 'may' is often construed as mandatory when the
statute is intended to· give relief," citing *Rex v. Barlow,
supra; Mason v. Fearson,* 9 How., U. S., 248, in which *Mr.
Justice Woodbury* said: "Without going into more details,
these cases fully sustain the doctrine that what a public cor-
poration or officer is empowered to do for others, and it is
beneficial to them to have done, the law holds he ought to
do."

Upon the foregoing unbroken line of authorities which, if
necessary, might be extended to almost every jurisdiction in
the Union, it is clear that the language of this statute should
be construed as mandatory. In the preamble of the act the
conditions existing in respect to the indebtedness of Madison
County are recited, which are admitted in this record to be
true. We have a debt contracted for the necessary expenses
of the county, which it was the duty of the defendant com-
missioners to pay. The payment of this debt was demanded
by every possible consideration—public justice, the interests
of the people of the county and the rights of the creditor

combine to demand relief. With all deference to the majority of the Court, I think no stronger case could be presented for the application of the principle which has been recognized as controlling the courts of England and America.

It must be conceded that the second question presented by the appeal is more difficult of solution. I cannot think that it should be answered by the suggestion that the power is not vested in the Legislature, for that "if the Legislature had this power a casual majority could practically confiscate all property in any county by directing the issue by counties named in the respective acts of large amounts of bonds and at an excessively high rate of interest, regardless of the wishes of the tax payers of such county." It is not necessary to cite authority to show that the Legislature has no power to compel or authorize a county to issue a single bond "regardless of the wishes of the tax payers," except for *necessary expenses*. *Smathers v. Comrs.*, 125 N. C., 480. What constitutes "necessary expenses" has been very clearly defined by this Court. It is not easy to perceive how, in the light of the constitutional restrictions as construed by this Court, the recognition of the power asserted in this act can bring about such disaster to the people. I most respectfully but firmly dissent from a canon of construction of the Constitution based upon the apprehension that the chosen representatives of the people of this State may not be trusted to discharge the duty imposed upon them by the Constitution, or be loyal to the trust reposed in them. We must look to the Constitution alone to find what powers are granted by the people to their agents. If the asserted power is granted, we may not, without doing violence to that instrument, prevent its exercise by indulging in grave apprehensions that it may be abused. The Courts may declare what power they have granted, but they will hold their agents responsible for the manner in which it is exercised.

The language of *Black, C. J.,* in *Sharett v. Mayor,* 21 Pa. St., 147, must commend itself to the heartiest approval: "The great powers given to the Legislature are liable to be abused.   But this is inseparable from the nature of human institutions.   The wisdom of man has never conceived of a government with power sufficient to answer its legitimate ends and at the same time incapable of mischief.   No political system can be made so perfect that its rulers will always hold it to its true course.   In the very best, a great deal must be trusted to the discretion of those who administer it. In ours the people have given large powers to the Legislature, and relied for faithful execution of them on the wisdom and honesty of that department and on the direct accountability of the members to their constituents.   There is no shadow of reason for supposing that the mere abuse of power was meant to be corrected by the judiciary.   There is nothing more easy than to imagine a thousand tyrannical things which the Legislature may do if its members forget all their duties, disregard utterly the obligations they owe to their constituents, and recklessly determine to trample upon right and justice. *   *   *   I am thoroughly convinced that the words of the Constitution furnish the only test to determine the validity of a statute, and that all arguments based on general principle outside of the Constitution must be addressed to the people, and not to us."

*Mr. Justice Iredell,* to whose wise foresight and clear conception of the principles of constitutional law and limitations we owe a debt of gratitude, said: "If a State Legislature shall pass a law within the general scope of their constitutional power, the Court cannot pronounce it to be void merely because it is in their judgment contrary to the principles of natural justice."   In *Calder v. Bull,* 3 Dall., 386, *Judge Baldwin* said: "We may think the power conferred by the

Constitution of this State too great or dangerous to the rights of the people and that limitations are necessary, but we cannot fix them,     *    *    *     we cannot declare a legislative act void because it conflicts with our opinions of policy, expediency or justice.   We are not the guardians of the rights of the people of the State, unless they are secured by some constitutional provision which comes within our judicial cognizance." *Bennett v. Boggs,* 1 Bald., 74.

*Nash, C. J.,* in *Taylor v. Comrs.,* 55 N. C., 144, said: "Whether the Legislature acted wisely or not is a question with which we have nothing to do.   The power being admitted, its abuse cannot affect it; that must be for the legislative consideration.   It is sufficient that the judiciary claim to sit in judgment upon the constitutional power of the Legislature to act in a given case; it would be rank usurpation for us to inquire into the wisdom or propriety of the act." *Brodnax v. Groom,* 64 N. C., 244; *Harris v. Wright,* 121 N. C., 172.

In *Norwich v. Comrs.,* 15 Pick., 60, *Shaw, C. J.,* says: "It will not throw much light on a question like this to put extreme cases of the abuse of the power to test the existence of the power itself." *Pearson, C. J.,* in *Brodnax v. Groom, supra.*

Certainly neither of these great Judges can be suspected of entertaining views dangerous to the reserved rights of the people or sustaining the assertion of doubtful powers by either department of the government.   While we should guard with jealous care the right of local self-government, and find no power to impose burdens by way of taxation or otherwise upon the people except when they have conferred it, we should at the same time be slow, save when our vision is clear, to set aside acts of the General Assembly.   Again invoking the words of *Judge Black:* 'We can declare an act of Assembly void only when it violates the Constitution

clearly, palpably and plainly, and in such manner as to leave no doubt or hesitation on our minds."

If I were permitted to speak my mind regarding the policy, wisdom and justice of the act under consideration, I would find no difficulty in declaring that, upon the admitted facts in this record, the statute is wise, just and promotive of the best and highest interest of the people of Madison County.

*Mr. Justice Montgomery,* in *Smathers v. Comrs., supra,* says: "The county of Madison was indebted to various persons, the consideration being the necessary expenses of the county already incurred, and being unable to pay the same and at the same time to conduct the ordinary business affairs of the county with its resources, obtainable through the taxes up to the full constitutional limitation, etc." This was said upon a record coming to this Court in 1899 in regard to a part of the indebtedness referred to in the Act of 1903. The history of the struggle with the indebtedness by the people of the county, as appears from the records of this Court and the acts of the Legislature, shows that, unless in the way provided in this act they may care for their indebtedness and have time within which to pay it, the county will soon be bankrupt and unable to discharge its duties, powers and functions as a part of the government of the State. There is no suggestion that these debts may be paid from any other resources than taxation. That they must be paid is beyond controversy. But the answer to the question presented for our decision must be found in the Constitution of the State, and not by considerations of this character.

This Court by its *Chief Justice* said, in *Ewart v. Jones,* 116 N. C., 570: "Under our form of government the sovereign power resides with the people and is exercised by their representatives in the General Assembly. The only limitation upon this power is found in the organic law as declared by the delegates of the people in convention assembled from

time to time." What, under our system of administrative government, are the relations of the General Assembly to the several counties of the State, and to what extent may the former control the administration of the latter, are interesting questions. It will be well to avoid the use of the term "municipal corporation," because there exists important distinctions between towns, cities and villages, which come strictly within that term, and counties, which are sometimes called "*quasi* municipal corporations," but are, strictly speaking, neither. Dillon Mun. Corp., sections 22, 23; *Moffitt v. Asheville,* 103 N. C., 249, 14 Am. St. Rep., 810. The Constitution, Article VII, provides for the division and government of counties, etc., and section 14 confers upon the General Assembly the power by statute to modify, change or abrogate any and all of the provisions of the said article and substitute others in their places (except certain sections not affecting the question under discussion). The history of the State since 1876 shows that the General Assembly, at its first session after the ratification of the Constitution, did repeal each section (save the ones excepted) and substituted others essentially different. Acts 1876-7, chapter 141. Many other changes equally as radical have been made from time to time, and this Court has recognized the absolute power of the Legislature to do so. *Harris v. Wright, supra.* The Court said: "Thus was placed at the will and discretion of the Assembly, the political branch of the State government, the election of county officers, the duty of commissioners, the division of counties into districts, etc." The power of the Legislature to establish, change and abolish counties is declared by this Court in *Mills v. Williams,* 33 N. C., 558. *Pearson, J.,* speaking of different kinds of corporations, says: "The division of the State into counties is an instance of the former. There is no contract, no party of the second part, but the sovereign for the better government and manage-

ment of the whole chooses to make the division in the same
way that a farmer divides his plantation off into fields and
makes cross-fences when he chooses. · The sovereign has the
same right to change the limits of counties, etc."

This Court has always held that counties are not liable to
an action for damages for injuries sustained by a defective
bridge or other parts of a highway; whereas a city or town is
liable to such action.    The reason upon which this distinction
is based is manifest.    In *White v. Comrs.,* 90 N. C., 437,
*Merrimon, J.,* discusses at length the relation which the
counties bear to the State, and says: "They are subdivisions
of its territory, embracing the people who inhabit the same,
created by the sovereign authority and organized for politi-
cal and civil purposes.    They are created by the sovereign
without any special regard for, or the solicitation, consent
or desire of, the people who reside in them, etc."    They are
not liable to be sued unless the Legislature by statute gives a
right of action.    In *Manuel v. Comrs.,* 98 N. C., 9, it was
held that in the absence of any statutory provision they were
not liable to be sued for negligence of their servants or
agents, as for damages sustained by one confined in the
county jail.    It is said that "counties are of and constitute
a part of the State government.    *    *    *    They are in their
general nature governmental—mere instrumentalities of gov-
ernment—and possess corporate powers adapted to their pur-
poses."    The distinction between the status and liability of
towns and counties is illustrated in *Lewis v. Raleigh,* 77 N.
C., 229.

In *Tate v. Comrs.,* 122 N. C., 812, this Court, discussing
the authority and power of the General Assembly to command
the commissioners of a county in respect to discharging the
duties imposed as a part of the State government, said: "The
defendants contend that the act is unconstitutional, (1)
Because, while the Legislature may authorize and empower

the County Commissioners to levy the special tax for a special purpose, it cannot direct or order them to do so. This contention is unfounded. Counties are but agencies of the State government. * * * They are subject to legislative authority, which can direct them to do, as a duty, all such duties as they can empower them to do." See also, *Wallace v. Trustees,* 84 N. C., 164.

The question is exhaustively and ably discussed by *Brinkerhoff, J.,* in *Comrs. v. Mighels,* 7 Ohio St., 109. He says: "A municipal corporation proper is created mainly for the interest, advantage and convenience of the locality and its people; a county organization is created almost exclusively with a view to the policy of the State at large for the purposes of political organization and civil administration in matters of finance, of education, or provision for the poor, and especially for the administration of justice. With scarcely an exception, all the powers and functions of the county organization have a direct and exclusive reference to the general policy of the State, and are in fact but a branch of the general administration of that policy."

It is undoubtedly competent for the Legislature to make the people of a county liable for the official delinquencies of the County Commissioners, and, if they think it wise and just, without any power in the people to control the acts of the commissioners or to exact indemnity from them." In *Dennis v. Maynard,* 15 Ill., 477, it is said that "The State does not allow itself to be sued, but it may hear, investigate and determine its own indebtedness and assume the debts to and from others, so it may direct the county authorities to ascertain and allow just claims upon the public treasury, or may ascertain and fix that amount and direct a raising of means by taxation for its payment. The public county and township funds are under legislative control. * * * These local municipal corporations are created for convenience

in the police arrangements, but their powers and duties remain subject to the legislative will through the legislative body." The identical question involved in this case came before the Supreme Court of Nebraska in *Commonwealth v. People,* 5 Neb., 127, in which it is said: "That Jefferson County is indebted to the relators for the amount of the warrants in question will not be controverted; and when such is the case there is no doubt of the power of the Legislature to require the county to issue its bonds for the amount of its indebtedness."

In *Locomotive Co. v. Emigrant Co.,* 164 U. S., 559, 576, *Mr. Justice Harlan* says: "The county of . . . . . . is a mere political division of the State, created for the State's convenience and to aid in carrying out within a limited territory the policy of the State. Its local government can have no will contrary to the will of the State, and it is subject to the paramount authority of the State in respect as well of its acts as of its property and revenue held for public purposes. The State made it, and could in its discretion unmake it and administer such property through other instrumentalities." *Taney, C. J.,* in *Maryland v. Railroad Co.,* 44 U. S., 534, says: "The several counties are nothing more than certain portions of territory into which the State is divided for the more convenient exercise of the powers of government. They form together one political body in which the sovereignty resides."

"The revenues of the county are not the property of the county in the sense in which the revenues of a private corporation are, and the power of the Legislature to direct their application is plenary. The county being a public corporation, which exists only for public purposes connected with the administration of the State's government, it follows that such a corporation, and of course its revenues, are subject to the control of the Legislature." *New Orleans v. Water Co.,*

142 U. S., 79; Smith Mod. Law. Mun. Corporations, section 756.

"And speaking generally, it may be affirmed that in any case in which compulsory taxation is found necessary in order to compel a municipal corporation or political division of the State to perform properly and justly any of its duties as an agency in State government, or to fulfill any obligations legally or equitably resting upon it in consequence of any corporate action, the State has ample power to direct and levy such compulsory taxation, and the people to be taxed have no absolute right to a voice in determining whether it shall be levied through their representatives in the Legislature of the State." Cooley on Taxation (3 Ed.), 1303.

Without further extending this opinion, I have reached the following conclusions: The State government having assumed the discharge of certain well-defined administrative duties in regard to opening and keeping in repair public highways and bridges, providing for the indigent, the insane, and other objects of her care, the administration of public justice through the courts, the punishment of crime, etc., involving the erection of court-houses, jails and reformatories, has established, among other agencies for the better discharge of these duties and purposes of government, counties, and in a restricted sense chartered towns and cities and committed to them in the territory marked off the duty of administering for the State these and such other necessary duties as may be assigned to them.

For the purpose of enabling the State to discharge these governmental functions, the people in their Constitution have granted to the legislative department power to make all necessary laws, including the power to contract debts, levy taxes, etc., within, and controlled by, certain well-defined constitutional restrictions and limitations; that this power may be exercised, either through agents selected by the people of the entire State, or through agents selected by the

people within the territorial limits marked off and designated as counties; that these agencies are required, for the purpose of carrying out the general policy of the State, to provide the necessary means. In doing so they may contract debts for necessary expenses and, within the constitutional limit, pay the same out of the ordinary revenues. If they find it necessary to exceed such limit, they may, with the consent of the Legislature, levy taxes to pay debts contracted for such purposes. It seems to me that it is clearly within the power conferred upon the Legislature to impose upon the county officers, who are in a certain sense State officers, the duty of providing for the payment of the indebtedness contracted for necessary expenses, which is equivalent to saying expenses incurred in the discharge of their duties and powers in carrying out the general policy of the State and discharging its functions. If the Legislature may command the authorities to levy a special tax beyond the constitutional limit to pay such debts, I am at a loss to perceive why it may not command them, with the consent of the creditor, to make provision by issuing bonds with which to raise the money to pay them. If the Legislature may direct the Governor and Treasurer to issue the bonds of the State to pay the expenses of the penitentiary and asylums, both being State agencies, I cannot see why it may not, in the exercise of the power drawn from the same constitutional source, direct the counties to do so. With the policy or wisdom of the statute we have nothing to do. In *Edwards v. Comrs.,* 70 N. C., 571, *Reade, J.,* says: "But levying taxes is not the only way which the defendants have to meet the plaintiff's debt. A liberal construction of the statute upon which they rely enables them not only to give a creditor a bond for his debt, if he will take it and indulge the county, but if he will not take it, then to raise money by the issue of bonds, and with the money so raised to pay off the debt." The manner in

which the provision is to be made for paying the debt is entirely within the discretion of the Legislature. The people of the county are represented in an especial way by its own Senator and Representative, but as a part of the people of the entire State they are represented by all of the members. They must look to them to see that no harsh or unjust or oppressive burdens are put upon them. Within the orbit assigned them by the Constitution they may act without interference or question by us.

If I am correct in my conclusions upon the question, the answer to the third must be conceded. When a duty not involving the exercise of a discretion is imposed upon a public officer, the power and duty of the courts to compel the performance of such duty by *mandamus* is clear. The Legislature prescribes the remedy; the courts enforce it. The power of the Legislature to establish boards of audit and other appropriate agencies to ascertain the amount of the debt and the consideration upon which it is based is not questioned. To what extent the commissioners are bound by its conclusions and excluded from litigating in the courts is not presented in this case, and I express no opinion in regard to it. I expressly refrain from expressing any opinion as to the power of the Legislature to compel by a bond issue the payment of a county debt contracted for any other purpose than necessary expenses.

There are other questions presented upon an appeal before us in the case of *Jones v. Comrs.*, in regard to which I express no opinion here. My dissent is based upon the agreed facts in this record.

MONTGOMERY, J., concurs in the dissenting opinion.

WALKER, J., concurring. The conclusion reached by the Court in this case appears to me to be right. Whether under our system of government and the special provisions of the

Constitution relating to counties, the Legislature has the power to compel a county to issue bonds for an existing indebtedness, either for the purpose of liquidating and renewing it or of paying it, is a very interesting and important question. In solving it we should not rely too much upon the decisions in other States, as the solution may depend, to some extent at least, upon the laws of the particular State in the courts of which the question is presented, and also upon a general consideration of the powers of the Legislature under the State Constitution. We would not be safe in saying that it should be settled upon principles of general law applicable to such cases, without taking into account any local provisions of law or any peculiar constitution of our local system of government by which those general principles may be modified. In the view taken by me of the case, it will not be necessary to express an opinion as to the power of the Legislature to require a county to pay its existing indebtedness by issuing bonds or to exchange new bonds for those outstanding and not yet matured. It can be well seen how the exercise of such a power, if conceded, might work injustice, and by one of the elementary rules of construction an intention to exercise such a power, if injustice may ensue therefrom, should not be presumed, in the absence of a clear and explicit declaration to that effect, but on the contrary that meaning should be adopted which will avoid such a result. Black Int. of Laws, pages 87 and 100. Rules 41 and 46.

A careful reading of the act in question and a consideration of it, not in detached portions but in its entirety, convinces me that the Legislature intended to confer upon the commissioners merely a discretionary power, or, in other words, authority to issue the bonds if in the exercise of their judgment they found it best for the interests of the people to do so. Why construe the act as a command to the com-

missioners to issue the bonds when it had not been definitely
determined, and could not ·well be, that the creditors would
accept the new bonds or even accept payment in money in
advance of the maturity of the bonds held by them, and
when they were not bound to accept either.   Is it not more
reasonable to infer that the legislative purpose was to give the
commissioners power to act in the premises as the situation
might be presented to them and according to their best
judgment.   It would be strange indeed if the Legislature
should peremptorily order bonds to be issued before it had
been ascertained whether the commissioners would be able
to execute the order.   But the language of the act itself is
sufficient to show that the Legislature did not intend its
provisions to be mandatory.   In the title of the act and in
every section where power to issue bonds is given there is
not a single word of command, but every expression used
implies discretion, and in the concluding section, by the use
of the words "if the bonds authorized by this act are issued,"
it clearly appears that a discretion was left to the commis-
sioners, because there could be no such doubt or contingency
as therein implied if they were required to issue them
whether they thought it proper to do so or not.   Those words
cannot be considered as referring to the possibility of a
refusal by the creditors to accept the bonds, for the commis-
sioners are authorized in that event to sell the bonds and pay
the matured indebtedness.   Indeed, the provision is that all
of the indebtedness, however evidenced, shall be paid with
the proceeds of the sale of the bonds (section 10), the credi-
tors having the option to take bonds instead of money (sec-
tion 11), and if the creditor so elects, it is then made the duty
of the commissioners to give him bonds at par to the amount
of his claim and in liquidation thereof.   There is another
view of the act which supports the construction that by it the
commissioners have the right to decide whether bonds should

be issued or not. In those sections which refer to the issuing of bonds the words simply confer power and authority, and the same may be said of the title of the act; whereas in the sections which provide for an exchange and settlement with the creditors after the bonds are issued, and which refer to the other duties to be performed under the act, the language is changed so that the directions to the commissioners become positive and peremptory. It does seem to me that if it was intended the provisions of the act should be mandatory, words more appropriate to express such an intention than those we find in the act would have been used. We derive little or no aid from decided cases in construing the act. We must examine the context in order to ascertain the meaning, and no two cases under the circumstances will be found to be alike. It is true the word "may" is sometimes construed as mandatory when something is directed to be done for the sake of justice, or when the public interests or individual rights call for the exercise of the power conferred, but it is conceded that "the words 'authorized and empowered' are usually words of permission merely," and neither the word "may" nor the words "authorized and empowered," nor any other equivalent term, will be construed as imperative if the context of the act shows that such was not the purpose. In the cases cited in support of the contrary view, the plaintiffs were attempting to enforce payment of their claims by a tax levy, and not by the issue of bonds, and to the relief sought by them they had an inherent right. It was really a part of the contract that the debts of the county should be paid in that way, and the legislation was merely in aid of the enforcement of this right. But creditors of this county have no right to receive bonds for their claims. That was no part of the contract. The law, when the original bonds were issued, provided how county debts should be paid—by taxation—and if the Legislature had provided that a tax "may" be levied

for the payment of the county's liabilities, the authorities cited would perhaps be applicable, and the courts could compel compliance with the requirements of the act within the limits of taxation fixed by the Constitution.

I do not think the cases relied on to show the plaintiff's right to a *mandamus* will be found to conflict with the conclusion we have reached, if they are considered with reference to their special facts and the particular relief demanded. The words quoted from the case of *People v. Supervisors,* 68 N. Y., 114, namely, "that the said board may in their discretion cause the tax to be levied," when read with what precedes them will be found to refer not to a discretion to levy the tax, but to a discretion given to the supervisors of the county to decide whether the tax should be paid by the county or by the two towns specially benefited by the construction of the bridge, and they decided that it should be paid by the two towns. There was nothing in the way of paying the assessment upon the towns by taxation, and it was held that they should be compelled by *mandamus* to levy the necessary tax, and, so far as the ultimate question decided is concerned, the other cases cited are like that one. The principle of those cases is familiar, but it does not seem to me to have any bearing on our case and should not affect the result. The reasons I have given are to my mind sufficient to support the conclusion of the Court, and it is not therefore deemed necessary to discuss the other questions argued before us.

It is fortunate that we have been able to reach a conclusion upon a consideration and construction of the act itself which saves to the people of the county the privilege of local self-government. It may be that the Legislature has the power to control directly the action of the county authorities, and I have no disposition at present to controvert the proposition, but the right of the people of the county to manage

135——17

their own affairs should not be abridged, except under the pressure of a plain and positive legal requirement and when no alternative in the law is admissible.