## JONES v. COMMISSIONERS.

(Filed March 28, 1905).

*"Authorize and Empower" Construed—Power of Legislature—Mandamus.*

1. The terms "authorize and empower" used in an act conferring power upon a county, on the verge of bankruptcy, to issue bonds to fund its existing indebtedness incurred for necessary expenses and providing the only feasible method by which the financial affairs of the county can be placed on a sound basis, will be construed to be mandatory.

2. The Legislature has power to pass an act, compelling a county to issue bonds to fund its existing indebtedness incurred for necessary expenses.

3. *Mandamus* is the proper remedy against county commissioners who refuse to issue bonds, as required by an act of the Legislature.

CLARK, C. J., and WALKER, J., dissent.

JONES *v.* COMMISSIONERS.

PETITION OF PLAINTIFF TO REHEAR.

For former opinion see 135 N. C., 218.

In 1887 the county of Madison having become indebted to various persons for necessary expenses, the Legislature passed an act to enable said county to settle such indebtedness by issuing coupon bonds, payable twenty years from date, bearing interest at 6 per cent. See chapter 398, Laws 1887. Under and by virtue of this act bonds were issued and such indebtedness taken up to the amount of $25,000, or near that sum. No payment of any consequence has been made on such indebtedness.

In addition to these bonds and the interest thereon, unpaid claims for necessary expenses have further accumulated against the county to the amount of $45,000 or more.

To enable the county to pay off these debts, or take up the same, the Legislature passed the act now under consideration, empowering the commissioners of said county to issue coupon bonds to the amount of $75,000, payable thirty years after date, and bearing interest at 5 per cent.

An examination of this entire act, chapter 289, Laws 1903, being helpful to its correct construction, and there being words in so many of its sections that aid in arriving at its true meaning, the entire act will be here set out:

AN ACT TO LIQUIDATE AND SETTLE THE OUTSTANDING IN-
DEBTEDNESS OF MADISON COUNTY, AND TO AUTHORIZE THE
ISSUE OF A SERIES OF BONDS FOR THE PURPOSE OF PAYING
OFF FLOATING DEBT, OLD BONDS, ETC., CONTRACTED FOR
THE NECESSARY EXPENSES OF SAID COUNTY.

WHEREAS, by an act of the General Assembly of North Carolina, Public Laws of 1887, chapter 398, hereinafter referred to, the Commissioners of Madison County were authorized to issue the bonds of the county, not to exceed the

sum of twenty-five thousand dollars, bearing interest at six per cent., payable semi-annually, and in conformity with the said act the Board of Commissioners of Madison County issued the bonds of said county, amounting in all to twenty-one thousand dollars, with coupons attached, in conformity with the said act;.

AND WHEREAS, the said bonds are now an outstanding indebtedness against said county, and the said county will not be able to pay the principal of the same at maturity;

AND WHEREAS, it is to the best interest of the tax-payers of the said county that the said bonds should be renewed before their maturity by refunding the same at a lower rate of interest than six per cent., and also that the present floating debt of the said county, incurred for the necessary expenses thereof prior to the first day of January, 1903, together with all accrued interest due at ·the date of payment or refunding, be liquidated and funded by issuing a new series of bonds to cover the same and to embrace .the entire debt of said county incurred for the necessary expenses, as it existed on January 1, 1903, with the interest thereafter accruing: now therefore,

*The General Assembly of North Carolina do enact:*

SECTION 1. That the Board of Commissioners of Madison County are hereby authorized and empowered to issue coupon bonds not to exceed in amount the sum of seventy-five thousand dollars ($75,000), to be issued in the denominations of one thousand and of five hundred dollars respectively, said bonds to be dated June 1, 1903, and to become due and payable on the first day of June, 1933, and to bear interest at the rate of five per centum per annum, payable semi-annually, on the first days of June and December in each and every year until said bonds shall be paid,

said bonds to be issued only to liquidate outstanding bonds and fund the debts incurred for the necessary expenses of said county prior to January 1, 1903, with their accumulated interest, and to express that fact upon their faces, bonds and coupons to be payable to bearer at the First National Bank of New York, or at such other bank or place that may be agreed upon by the said commissioners and the purchasers of said bonds.

SEC. 2. That the coupons attached to the said bonds shall bear the number of the bond to which they shall be attached, and as they mature and thereafter, they shall be receivable in payment of all county taxes and debts due the said county. The purchaser or purchasers of said bonds, or any of them, shall not be required to see to the application of the purchase-money thereof.

SEC. 3. That in order to pay the interest on said bonds as it may accrue, and to pay the principal thereof, when it matures, the Board of Commissioners of Madison County is hereby authorized to annually levy a special tax to pay the said interest, and principal when the same becomes due. Said taxes shall be levied and collected as other county taxes are levied and collected and shall be imposed upon such property, polls and other subjects of taxation as are now or may hereafter be subject to taxation in this State, and it shall be collected by the officer or officers charged with the collection of other county taxes, and who shall in respect thereto be liable officially as well as personally for the collection of said taxes, and the said commissioners are hereby directed and required to levy a tax each year fully sufficient to pay one year's interest on said bonds.

SEC. 4. That the said bonds shall be signed by the chairman of said board of commissioners and countersigned by the clerk of the same and they shall bear the seal of the said

county, said coupons to bear the lithographed signatures of said chairman and said clerk.

SEC. 5. That the said Treasurer of Madison County shall keep a separate book of account in which shall be regularly, promptly and accurately entered all the moneys from time to time derived from the collection of the taxes herein authorized and all the coupons paid upon the said bonds, with a statement of how the same are paid and all disbursements of the said moneys made by him; and an annual statement of the sundry moneys as collected separately from the poll and property taxes herein provided, and said books shall be at all times open to the inspection of the public.

SEC. 6. That the Board of Commissioners of Madison County shall keep a separate book of account in which shall be entered every item of outstanding indebtedness incurred by said county for its necessary expenses prior to January 1, 1903, as reported to them by the board of audit, herein provided for, together with a complete and accurate record of all the bonds issued under this act, the names of the purchasers thereof and of their subsequent transfers as well as a record of all the coupons received by them in payment of taxes or other debts due the said county and all coupons taken up and cancelled, and such books shall at all times be open to public inspection.

SEC. 7. That for the purpose of ascertaining what part of the present floating and unliquidated debt of the said county was incurred for its necessary expenses prior to January 1, 1903, the chairman of the said board of commissioners and P. A. McElroy and Charles B. Mashburn, all of Madison County, are hereby constituted and appointed a special board of audit on behalf of the tax-payers of the said county until the first day of June, 1903, to scrutinize, examine and adjust and report to the said board of commissioners all bonds, claims and debts contracted by the said

county prior to the first day of January, 1903, which are still outstanding unsettled and unliquidated. They shall meet as such board and elect one of their members chairman, and the board of commissioners of said county shall fill all vacancies therein. They shall sit together, and adjourn from time to time as may be necessary, and shall severally receive as compensation for their services the sum of ten dollars and one dollar per diem for each and every day they shall actually sit for the purposes herein mentioned. The findings of said board of audit shall be conclusive proof as to whether any bond, debt or claim was contracted for the necessary expenses of said county, prior to January 1, 1903.

Sec. 8. That they are hereby authorized, empowered and directed to adjust on such terms as may be equitable and just all of the said floating and unliquidated indebtedness of said county, and they shall report to the said board of commissioners all claims audited by them, with their finding thereon, recommending the respective amounts to be allowed the divers claimants and sundry creditors of said county whose debts shall be a part of the present floating debt of said county, unliquidated and submitted to them for settlement, and provided two of said board concur as to each separate claim, and no bonds shall be issued, exchanged or sold in settlement of any part of the unliquidated or floating debts of the said county which has not been by them passed upon and allowed.

Sec. 9. That immediately after the ratification of this act the chairman of the said board of commissioners shall advertise in some newspaper published in the county of Madison, and at the court-house door in said county, for thirty days, of the place and time when and where the said board of audit shall sit and require all persons holding debts against said county incurred prior to the first day of January, 1903, to present the same before the said board of

audit at the times and places mentioned that the same may by them be inquired into and reported as herein directed, and the said chairman shall also promptly give written notice by mail to all non-resident creditors, whose place of residence may be known, to appear before the said board of audit within the time mentioned and to present their claims to be audited and adjusted as provided by this act.

SEC. 10. That the said board of commissioners are hereby authorized to retire all of the outstanding bonds issued under chapter 398 of the Public Laws of 1887, with the interest due thereon, at their par value and pay off and discharge all of the outstanding indebtedness of the said county, incurred for the necessary expenses thereof prior to January 1, 1903, as herein provided, by selling so many of the bonds issued under this act as may be necessary for such purpose and by applying the proceeds thereof to the liquidation of such bonds so retired and of such debts. The bonds authorized and sold under the provisions of this act shall be sold for not less than their par value. Said bonds, when issued, shall be placed by the said board of commissioners in the hands of the treasurer of said county, whose duty it shall be to sell the same, and when sold the money arising from said sale shall be exclusively applied, as in this act provided, to the payment of the outstanding indebtedness of Madison County, incurred prior to January 1, 1903, and he shall receive as full compensation for his services rendered under this act one-fourth of one per cent. of all sums disbursed by him.

SEC. 11. That if any creditor of the said county, whose debts or claims come within the meaning of this act, or any holder of any bond or bonds of said county, shall desire to exchange his bond or bonds and coupons or other evidence or evidences of said indebtedness belonging to him, for one or more bonds hereby authorized, it shall be the duty of the said

commissioners to pay off the said creditor or creditors and liquidate the said indebtedness in the bonds authorized by this act, exchanging said bonds at their par value and cancelling the evidences of indebtedness taken in lieu thereof.

SEC. 12. All of the bonds issued under this act shall be exempt from county and municipal taxation.

SEC. 13. That the special taxes provided for in this act shall be collected in the same manner and at the same time and subject to the same regulations and penalties as are the general taxes of said county and shall be turned over to the treasurer by the sheriff or tax collector of said county, and the said treasurer shall give an original and duplicate receipt therefor to the said officer, one receipt to be kept by the said sheriff or tax collector and the other shall be filed by him with the board of commissioners of the said county at their next regular meeting and shall be recorded and kept by them as the other records of their office; said receipt shall specify the amount collected from the property tax separately from that collected from the poll tax, and such receipt shall be received as *prima facie* evidence of the truthfulness of their recitals in any court of competent jurisdiction.

SEC. 14. That the said commissioners shall have the power and they are hereby authorized and directed to require the said Treasurer of Madison County, before the proceeds arising from the sale of any of the bonds issued under this act shall go into his hands, as treasurer to increase his bond in the additional sum of not less than ten thousand dollars, justified and executed as required by law with sufficient sureties, conditioned that he will faithfully execute the duties of his office, as is now required of him by law.

SEC. 15. That the treasurer of said county shall pay the interest on the bonds authorized by this act semi-annually as the coupons become due, out of the moneys derived from the special taxes provided for and collected under this act,

whenever the said coupons after their maturity shall become due as provided by this act.

SEC. 16. That should any surplus remain in the hands of the Treasurer of Madison County after paying the interest due upon the said bonds for the then current year, that the same shall be applied to the payment and redemption of the principal of the bonds herein provided for: *Provided,* the holders of said bonds or any one or more of them shall be willing to surrender the same; and should they be willing to surrender one or more of the same for payment before they become due, then the commissioners of said county are hereby authorized to apply the same on the payment of the interest falling due upon said bonds for the next succeeding year or years and to a diminution of the next following tax levy.

SEC. 17. That if any officer of Madison County or employee thereof shall apply the proceeds of any bond issued under this act, or exchange any such in any manner or for any other purpose, or shall issue or have issued any more of the bonds provided for in this act than may be necessary for the specific purposes of this act, or shall knowingly or unlawfully misapply any of the moneys derived from the tax levies herein authorized, or shall fail and refuse to perform the duties imposed upon him by the provisions of this act, shall be guilty of a felony and upon conviction shall be fined not less than one thousand dollars and imprisoned not less than twelve months, in the discretion of the Court.

SEC. 18. That the taxes that have been collected, and that are to be collected upon the levies heretofore made under the said laws of 1901, shall be applied by the treasurer of said county as therein directed and for no other purpose.

SEC. 19. That if the bonds authorized by this act are issued, the board of commissioners of said county shall not levy the tax of twenty-five cents on property and sixty cents

on the poll as authorized by section 8 of chapter 322 of the
Public Laws of 1901, but shall levy a sufficient tax on prop-
erty and polls to pay the interest on said bonds, and a suffi-
cient amount to pay the principal of said bonds when they
become due, as hereinbefore provided by section 3 of this act.

SEC. 20. That this act shall be in force and effect from
and after its ratification.

Under and by virtue of this act the county commissioners,
acting under advice that the statute was mandatory, on the
20th April, 1903, made an order to put the act into effect,
directing that bonds to the amount of $75,000 be issued to
pay off the debt of the county contracted for necessary ex-
penses of the county prior to the first of January, 1903.
The order further directed that the auditing board consti-
tuted by the act should give due notice and meet and pro-
ceed to comply with the duties imposed upon them. On the
first Monday in May, 1903, the commissioners having been
differently advised, to-wit, that the act was discretionary,
revoked so much of said order as directed the bonds to issue.
The auditing board as provided by the act and order of the
commissioners met and audited and allowed the claims due
by the county for necessary expenses, including the debt
herein sued for.

The plaintiff holding this claim, being bonds and coupons
issued under the first-named statute to the amount of
$21,000, demanded of the commissioners that they proceed
to comply with the terms of this last act, and exchange the
bonds authorized by said act for indebtedness held by him
at their par value as provided in section 11. The commis-
sioners of the county refused to comply with such demand
and have failed and refused to take any action under the
statute in reference to the issue, sale or exchange of the
bonds. The plaintiff then instituted this suit and issued a
summons against the county commissioners, returnable be-

fore E. B. Jones, Judge, at term time at October Term, 1903, of Madison Superior Court. Pleadings were regularly filed and by consent duly signed in writing; the Court tried the case on all issues of fact and law raised by the pleadings.

The above statement is taken from the record and the findings of fact made by the Judge. Judgment was rendered commanding the commissioners to proceed under the statute and make exchange of the bonds with the plaintiff at the par value of the new bonds. The defendant excepted to this order and appealed, claiming first, that the Court had no jurisdiction, for that this was a money demand and that the summons should have been returnable to the Court in term time; second, that the act confers discretionary power and is not mandatory; and third, if it is mandatory, it is unconstitutional and not a statute which the Legislature has the power to pass.

The appeal was heard by the Supreme Court at Spring Term, 1904, and was then decided against the plaintiff, the Court holding that the act conferred only discretionary authority upon the commissioners, and that the Court could not interfere. There were dissenting opinions by two members of the Court as then constituted, and on this petition to rehear, filed in apt time, one of the Justices who concurred in the former opinion entered an order formally allowing the rehearing, and the case is now before us under that order.

*Charles E. Jones, Davidson, Bourne & Parker* and *Shepherd & Shepherd,* for the petitioner.

*Gudger & McElroy* and *T. S. Rollins,* in opposition.

HOKE, J., after stating the facts. This case has heretofore been decided by the Court in favor of the defendant and an opinion to that effect has been reported in 135 N. C.,

218.  A like decision in a case substantially similar was made in *Bank v. Commissioners,* 135 N. C., 230—*Justices Connor* and *Montgomery* dissenting in each case.

After full and careful consideration, the majority of the Court are now of opinion that the former decision was erroneous, and the law governing the case on the main questions presented is in accord with the dissenting opinions of *Mr. Justice Connor* filed in the two cases mentioned. The view of the Court which now prevails is so fully and clearly expressed in these dissenting opinions that we would be well content to adopt them as the opinion of the Court, but as the more extended dissenting opinion is filed in *Bank v. Commissioners,* and our present decision is of momentous concern to the parties litigant, involving, as it does too, a reversal of the former ruling of the Court, we have deemed it proper that we should make some further statement of the reasons which have led us to our present conclusion.

The first objection made by the defendant was to the jurisdiction of the Court because, as contended by them, this is a money demand and the summons should have been returned to the Court in term time. This exception was determined against the defendant in the former opinion, and for the reasons therein stated this ruling should not be disturbed. Indeed, this question is really not before us on this petition, and is only referred to in order to show that the same has not been overlooked. The cause then is here for review on the second and third exceptions above stated:

Second. Is the act mandatory? Third. Had the Legislature the power to pass it?

The terms of the first section of the act conferring power to issue bonds are "authorize and empower" and in ordinary acceptation and in private transactions are usually permissive; but when these words are used in statutes they are frequently imperative, and where the statute is concerning pub-

lic interests, or promotive of justice, or to secure and main-
tain the individual rights of others, such words are well-
nigh uniformly construed to be mandatory. This rule is
stated by text-writers of approved excellence and is sanc-
tioned by courts of the highest authority both in England
and in the United States. Mr. Black, in his Interpretation
of Laws, page 541, formulates the rule thus: "Where a stat-
ute provides for the doing of some act which is required by
justice or public duty, as where it invests a public body,
municipality or officer, with power and authority to take
some action which concerns the public interests or the rights
of individuals, though the language of the statute be merely
permissive in form, yet it will be construed as mandatory,
and the execution of the power may be insisted upon as a
duty." And in commenting on the rule the author says:
"The most frequent illustrations of the application of this
rule are found in statutes authorizing the settlement of
claims held by private persons against the State or its
municipal corporations, and those making provision for the
levy and collection of municipal taxes." He then cites sev-
eral cases in which the term "may" and "authorized and
empowered" and "authorized" are respectively held to be
imperative, and then proceeds: "Even where the act pro-
vides that certain public officers, if deemed advisable, or if
they believe the public good and the best interests of the
city require it, may levy a certain tax, though these words
are purely permissive in form, yet the act will be held to be
peremptory whenever the public interests or individual
rights call for the exercise of the power granted. And, in
general, where the statute enacts that a public officer 'may'
act in a certain way which is for the benefit of third per-
sons, he must act in that way."

To the same effect is Throop on Public Offices, secs. 547
and 548, and Endlich on Interpretation of Statutes, sec.

311, Sutherland on Statutory Construction, p. 547. Adjudicated cases of like effect can be found in *Supervisors v. U. S.,* 4 Wall., 435; *City of Galena v. Amy,* 5 Wall., 705; *Mayor of N. Y. v. Furze,* 3 Hill, 612; *People v. Flagg,* 46 N. Y., 401; *People v. Supervisors,* 51 N. Y., 401; *Brokaw v. Bloomington,* 130 Ill., 482; *State ex rel. v. King,* 136 Mo., 309; *Inhabitants of Veazy v. China,* 50 Me., 518; *Johnson v. Pate,* 95 N. C., 68.

We are not contending here that the Legislature cannot, in terms, confer discretionary power, nor that permissive terms, when used in statutes, are always mandatory regardless of their placing and the general purpose of the statutes in which they appear, nor are we assailing the principle that where such power is expressly conferred it is usually not permissible for courts to interfere and undertake to direct how such discretion should be exercised. We are seeking to arrive at the true meaning of the Legislature as expressed in this statute, by established and accepted canons of construction.

These very terms "authorize and empower" are so frequently used in legislation 'of this character that they may be said to have attained a technical or statutory signification, and where a long course of judicial decision has put a certain interpretation on such words, it is a fair inference and a true rule of construction that the Legislature, in using these words, intended them to have their established meaning.

Again, as said in one of the authorities cited, 51 N. Y., 401: "To determine this question (whether the terms 'authorize and empower' are permissive or mandatory), not only the language of the act, but the circumstances surrounding its passage and the object had in view, must be considered." Here was a county on the verge of bankruptcy. As far back as 1887, and prior to that time, these debts for nec-

essary expenses had begun to accumulate, and then amounted
to $25,000. Issuing bonds to this amount under legislative
sanction, the county officers have paid neither principal nor
interest, with an exception so slight as not to be considered,
and, in addition to this, debts of like character have been
allowed to accumulate until there is $40,000 of indebtedness,
additional to the bonds, accrued to January 1, 1903, the
period named in the act. The authorities of the county had
failed to fulfill the purposes of its creation and the Legisla-
ture enacted this statute to remedy the evil, as will be seen
by a perusal of the entire act. It is a measure wisely con-
ceived, carefully prepared, and presents the only feasible
method by which this deplorable condition can be corrected
and the financial affairs of the county placed on a sound
basis. Such being its beneficent purpose, the Court should
be slow to construe the terms of the act discretionary, unless
such construction is clearly required. We do not understand
that the general principle here declared is questioned, but
some of our brethren are of opinion (and for their opinion
we have the greatest consideration) that there are expres-
sions in this act which forbid the application of the general
rule and require that the statute in question should be con-
strued as discretionary. The language chiefly relied upon
is that expressed in section 19, that "if the bonds authorized
by this act are issued." * * * This expression, stand-
ing alone and unexplained, would not of itself be sufficient,
we think, to prevent the application of the rule we are dis-
cussing. Many of the decisions upholding this rule were
made on words much stronger than this expression would
impart to the meaning of the act. But it is not unexplained.
On the face of the act itself is found a full explanation of
these words, entirely consistent with the decision of the
Court on this question. It will be noted that the act pro-

137——38

vides in section 10 for the sale of the bonds, and in section 11 for their exchange with creditors holding claims, and in both sections it is directed that the bonds shall not be issued except at par value. It might turn out that the bonds could not be sold at par under section 10. It might turn out that the creditor would not exchange them at par under section 11; and so the restriction in section 19 is explained by the restriction which the Legislature had itself put on the power to issue the bonds. This expression, no doubt, had reference to such restriction, and did not and was not intended to weaken the imperative force of the words used in former sections of the act.

Again, it is contended that where the statute refers to the issuing of bonds, it uses the words "authorize and empower," but where it provides for a board of audit, as it does in sections 7, 8 and 9, it uses the terms "authorize, empower and direct." This difference, so far from supporting the construction contended for by the defendant, to our minds tends rather to confirm the decision on this point.

The act contains a complete and comprehensive plan for restoring order to the financial affairs of the county, and the issuing of bonds and the establishment of this board of audit are equal and dependent parts of the whole; one is as necessary to its successful operation as the other. The very fact that "authorize and empower" are used in one place, and "authorize, empower and direct" at another, tends to the conclusion that, in the minds of the draughtsman and legislators, the words had the same meaning and the same operative force and effect.

On the contrary, note how many of the requirements of the statute are couched in imperative terms: Section 4, in providing a form, says that the bonds "shall be signed by the chairman," and section 5, "the treasurer shall keep a separate account" * * * and section 6, "the Board of Commissioners of Madison County shall keep a separate

account"; in section 8 "the board of audit are authorized, empowered and directed to do their work"; section 15, "the treasurer of the county shall pay the interest."

It is true that these words are usually in connection with the terms "bonds hereby authorized," but they serve to throw some light on the legislative intent, and to sustain the position that "authorize and empower" in the first three sections of the act should receive their usual statutory acceptation. But this matter, we think, is conclusively set at rest by the language of section 11, and it is under this section that the plaintiff is now seeking to enforce his right. This section is as follows: "That if any creditor of the said county, whose debts or claims come within the meaning of this act, or any holder of any bond or bonds of said county, shall desire to exchange his bond or bonds and coupons or other evidence or evidences of said indebtedness belonging to him for one or more bonds hereby authorized, it shall be the duty of the said commissioners to pay off said creditor or creditors and liquidate the said indebtedness in the bonds authorized by this act, exchanging said bonds at their par value and cancelling the evidences of indebtedness taken in lieu thereof."

The very reason of the rule of construction here adopted, given in many of the decisions, is that where power is given in legislation of this character, a corresponding duty is imposed on the authorities to give the statute effect. The section here quoted, in express terms, imposes the duty which the creditor seeks to enforce. "Where the creditor desires to exchange his bonds or debt for bonds hereby authorized, and is willing to make the exchange at par, it shall be the duty of the commissioners to make the exchange."

On authority, and in consideration of the general purpose of the statute and in view of its several provisions, we do not hesitate to declare that the act is mandatory in its force and effect, and was so intended by the Legislature.

On the third question: Had the Legislature power to pass the act? The authorities are equally pronounced in favor of the plaintiff. We do not understand that the former opinion holds that the act is not within the legislative power. There is an intimation to that effect, however, and as the present opinion will result in the enforcement of the statute, it is necessary to decide the question.

These counties are not, strictly speaking, municipal corporations at all in the ordinary acceptation of the term. They have many of the features of such corporations, but they are usually termed *quasi* public corporations. In the exercise of ordinary governmental functions, they are simply agencies of the State, constituted for the convenience of local administration in certain portions of the State's territory, and in the exercise of such functions they are subject to almost unlimited legislative control, except where this power is restricted by constitutional provision. In *Hamilton v. Mighels,* 7 Ohio St., 109, it is said: "Counties are at most but local organizations, which for purposes of civil administration are invested with a few functions characteristic of corporate existence. They are local subdivisions of the State, created by the sovereign power of the State of its own sovereign will, without particular solicitation, consent or concurrent action of the people who inhabit them." Again it is said: "A county organization is created almost exclusively with a view to the policy of the State at large, for purposes of political organization and civil administration in matters of finance, of education, of provision for the poor, of military organizations, of the means of travel and transfer, and especially for the general administration of justice." "With scarcely an exception, all the powers and functions of the county organizations have a direct and exclusive reference to the general policy of the State, and are in fact but a branch of the general administration of that policy." These statements are quoted

with approval in 1 Dillon on Municipal Corporations, sec. 23; Smith's Law of Mun. Corp., Vol. 1, sec. 10, and are sustained by a line of authorities unbroken, so far as we have been able to discover. *People v. Flagg,* 46 N. Y., 401; *City of Galveston v. Pomainski,* 62 Tex., 118; *Philadelphia v. Fox,* 64 Pa., 160; *Locomotive Co. v. Emigrant Co.,* 164 U. S., 559, 576. Nowhere has this doctrine been more consistently adhered to than by our own Supreme Court, *Mills v. Williams,* 33 N. C., 558; *Wallace v. Trustees,* 84 N. C., 164; *White v. Commissioners,* 90 N. C., 437; *Tate v. Commissioners,* 122 N. C., 812; *Mial v. Ellington,* 134 N. C., 131.

It will be borne in mind that we are speaking of the power of the Legislature in matters governmental. We are not asserting the right of the Legislature to compel a county to create a debt in aid of a private enterprise, nor for purposes of strictly local benefit and advantage. In *Park Commissioners v. Detroit,* 28 Mich., 222, it was held that the Legislature could not compel the city authorities to contract a large debt in purchasing a park, and in *People v. Batchelor,* 53 N. Y., 128, it was held that the Legislature had no power to compel a town to subscribe to a railroad owned and controlled by private stockholders and operated for their own advantage. These decisions were in relation to towns in regard to which the power of the Legislature is usually more restricted, but as to counties also, they can, we think, be sustained by reason and authority.

This limitation of legislative power is not a debatable question in this State. It has been written into our organic law. In Article VII, sec. 7, of the Constitution, it is provided that no county, city, town or other municipal corporation shall contract any debt, pledge its faith, or loan its credit, nor shall any tax be levied or collected by any officer of the same, except for the necessary expenses thereof, unless by

vote of a majority of the qualified voters therein. This section was no doubt put in our Constitution because of the undefined and well-nigh unlimited power of the Legislature which existed at the time of its adoption, and it has not been altered or repealed. It will be noted that debts for necessary expenses are expressly excepted from this article of the Constitution, and all the debts which are the subject-matter of the statute now in question are of this character. It is not sought here to force the county to *create* a debt of *any* kind. These debts had already been created and were outstanding and drawing interest at six per cent. when this statute was passed. The current rate of taxation is not sufficient to pay them in full, and the statute, as heretofore stated, presents a comprehensive, carefully prepared, and feasible plan to fund the debt at a lower rate of interest and restore the county finances to a satisfactory condition. As here stated, this power of the Legislature over counties is fully sustained in *Tate v. Commissioners,* 122 N. C., 812, and is nowhere more forcibly and tersely expressed. This was an action to compel the Commissioners of Haywood County to put in force a legislative enactment requiring the county authorities to work their roads by taxation. And there was a judgment compelling the commissioners to put the law in operation. This authority is cited in the former opinion of the Court on the present case, and the distinction made between that and the case before us, in that, the making of roads was a governmental function; but we do not think the cases can be so distinguished. What are these debts to which this statute is addressed? They are all debts for necessary expenses. And what does this term import? They involve and include the support of the aged and infirm, the laying out and repair of public highways, the construction of bridges, the maintenance of the public peace and administration of public justice—expenses to enable the

county to carry on the work for which it was organized and
given a portion of the State's sovereignty. To say that the
Legislature has no control in such matters would enable the
county authorities of their own will to stay all govern-
mental action in their locality, and entirely defeat the pur-
poses for which they were created. This is one of the rea-
sons, no doubt, why necessary expenses were excepted from
the article of the Constitution just quoted. The exception
was partly made because it would be impracticable to refer
all of these current expenses to popular approval; but an
equally important reason was that local authority should
not be withdrawn from all legislative supervision and con-
trol.

It has been suggested that while the Legislature might
compel the laying of taxes, its power does not extend to the
issuing of bonds, but we do not think this position sound,
or that any such distinction exists. This method of adjust-
ing debts which counties have lawfully created is not at all
unusual. It was commended in *Johnson v. Commissioners,*
67 N. C., 101, and expressly sanctioned in *Jefferson County
v. People,* 5 Neb., 136; *Commissioners v. City,* 45 Ala.,
399; Cooley on Taxation (3 Ed.), Vol. 2, pp. 1300, 1301.

Again, it is contended that while the power to the extent
claimed may exist in other jurisdictions, it cannot obtain
here where the officers and agents who carry on the county
government are given a place in our Constitution and their
existence thereby secured. As we apprehend this position,
it is argued that the very fact that these officers are so placed
manifests a purpose to give them exclusive or much larger
power in the management and control of local affairs. Some
expressions to this effect have found their way into a few of
our decisions, notably, *Brodnax v. Groom,* 64 N. C., 244,
and *Cromartie v. Commissioners,* 87 N. C., 134. It will be
noted that in these cases the Court was passing on the right

of the courts to interfere with the action of the commissioners, and the question of legislative power was not at all before them, and any such effect from these intimations is expressly repudiated and condemned in *Tate v. Commissioners, supra.* Even under our Constitution, as it originally existed, we do not think the position here contended for could be maintained. True, these offices were there created, and as the instrument then stood they could not be changed or destroyed; but what such officers, as agents of the State, could or could not be compelled to do was not stated in matters to which this discussion is addressed. However this may have formerly been, the position cannot be for one moment sustained under the Constitution as it now stands.

In 1875 the article in reference to counties was amended. For grave and weighty reasons, the people then added to their Constitution section 14 of Article VII, and it was there provided as follows:

"Section 14. The General Assembly shall have power by statute to modify, change or abrogate any and all of the provisions of this article, and substitute others in their place, except sections 7, 9, 13."

Section 7 is the one already quoted, and from its effect debts for necessary expenses are expressly excluded. Section 9 stipulates in general terms that taxation shall be uniform and *ad valorem.* Section 13 prohibits the payment of debts contracted in aid of the Confederate government. Neither of these exceptions in any way affects the question now before us, and, by the provisions of this amendment, the power of the Legislature to supervise and control the action of county officers in government matters is fully restored, even if it had ever been withdrawn.

While the Court has every disposition to uphold the principle of local self-government, the history of this transaction, as shown in the record, is in itself almost a demonstra-

tion that it is not amiss, and at times altogether desirable, to have a supervising representative authority with power and disposition to intervene when local officers have failed and refused to perform their official duties.

We declare our opinion to be that the Court below had jurisdiction; second, that the act in question is mandatory; third, that the Legislature had power to pass the act; and fourth, that the remedy sought is the proper remedy.

Let this opinion be certified, to the end that the judgment of the Superior Court be affirmed and that process issue to enforce its provisions.

Petition Allowed.

BROWN, J., concurring.  I desire to express a few words of approval of the forcible opinion written by *Justice Hoke* on behalf of a majority of the Court upon the rehearing of this case.  My attention was first drawn to its importance by the exhaustive, and to my mind conclusive, dissenting opinion of *Justice Connor* in *Bank v. Commissioners,* involving the same questions, 135 N. C., 230.  After giving the case that careful thought which its importance demands, I fully concur in the reasoning and conclusions of the opinion of the Court.

I will briefly notice one matter not touched upon.  By sections 7 and 8 of the Act of 1903, a special board of audit was created with power to adjudicate and report the amount and status of the indebtedness of the county to be discharged and funded in accordance with the financial scheme, set out in the act, with power to adjust the same on an equitable basis.  The findings embodied in the report of the board were made conclusive on the county, and *prima facie* correct and competent in any court of justice in the State.  This board duly advertised for creditors as required by the act, and duly passed upon, audited and adjudicated the indebtedness of the county and reported the same to the board of

commissioners. The record discloses the fact that the board of commissioners met in session on April 20 and passed a resolution directing the issue of the bonds, in manner and form as provided in the act. Notice was fully advertised requiring all creditors to present their claim before the board of audit, which was evidently done. The board of commissioners adjourned and terminated their meeting of April 20 and met no more, so far as the record discloses, until the regular meeting on the first Monday in May. At this May meeting the board of commissioners attempted to revoke the order of April 20, and directed that no bonds be issued under the act.

I am of opinion that, if the defendants had any discretionary power under the act, they exercised it once for all on April 20, when they directed the issuance of the bonds. If the statute was dependent upon the contingency of their approval, the commissioners of the county gave it force and vitality by their resolution of April 20, and that they could not at their subsequent meeting lawfully revoke it.

When the board adjourned their special session *sine die* on April 20, the rights of creditors at once attached under the act, and at their regular meeting in May the commissioners could not lawfully destroy those rights.

A very material enhancement in value was imparted to the bonds and script of the county by the action of the defendants on April 20. This indebtedness is doubtless of a negotiable character in form, and that its purchase and sale were thereby greatly accelerated, I do not doubt. It is possible, nay probable, some of it between April 20 and the May meeting found its way for value into the hands of innocent purchasers, who had a right to rely upon the stability of the solemn act of the commissioners. They cannot order a debt paid at one meeting, revoke it at the next meeting, re-order it paid at a succeeding meeting, and so on.

The board of commissioners, as the trustees and guardian of the county, cannot be permitted to play "fast and loose" with the rights of creditors whose obligations are admitted to be just, as well as the true interests of the citizens and tax-payers, who naturally desire to see the credit of their county maintained untarnished.

Municipalities are no more justified in neglecting their honorable obligations when the means are at hand provided by law for their adjustment than are private individuals, who contract honest debts and have the property with which to pay them. The General Assembly evidently thinking so, has given the defendants ample means necessary to settle and adjust the indebtedness of their county. It has provided a wise and beneficent financial scheme whereby it can be done without great stress of taxation. It is the duty of the defendants to avail themselves of such means, and to carry out cheerfully and in good faith the will of the law-making power.

I am not at all alarmed at pessimistic predictions or filled with fearful forebodings as to the consequences which may flow from this decision. It is but a proper recognition of the legitimate power of the General Assembly to compel counties to live up to their legal contracts and to pay their honest and undisputed debts. It will have a very salutary effect upon the action of boards of commissioners and teach them to be economical and careful as to how they spend "other people's money." Besides, such legislation is carefully safeguarded by the Constitution of the State. Those wise provisions, which prevent hasty legislation upon such subjects and require a recorded vote, have been steadfastly upheld by this Court.

I am of opinion that the petition to rehear should be allowed and that the writ of *mandamus* should issue as prayed for.

JONES *v.* COMMISSIONERS.

CLARK, C. J., dissenting.  This case was decided in 135 N. C., 218, and it is not shown that any authority or fact has been overlooked.  Clark's Code (3 Ed.), p. 945, and numerous cases there cited.  As this is the first instance in the books, in which it has ever been held that the courts can compel a county to issue bonds upon a statute which merely "authorizes" it to issue them, it is well to scrutinize an innovation which must inevitably lead to startling results in the future.

It is the province of the courts to direct payment of indebtedness either by issuing execution or by a *mandamus* to levy a tax when the Legislature has authorized a tax, or the indebtedness, which the municipality has created.  But no Court has issued an order that the debt of a county shall be funded.  When the statute authorizes a debt, the expression "may levy a tax" has been construed "shall" because the enforcement of payment is a judicial function and the courts will order the debtor to do what he may do to effect payment.  This is the purport without exception of every case cited by the Court in which "may" has been construed "shall."  But issuing bonds is not payment.  It is an act which can only be made effectual by mutual agreement between the creditor and the debtor and is in fact an agreement not to pay for a specified time.  The Court can no more order bonds to be issued than it can compel the creditor to accept them.  Neither is it in the scope of judicial power in the absence of an agreement between the parties.  Nor is it a legislative function to order a municipality to issue bonds, thereby deferring payment, any more than it is to command immediate payment.

A brief consideration will show that the Legislature in this act has done no more than "empower and authorize" the county to issue bonds—that is, if the county and the creditors should so agree, otherwise the issuing bonds

would be a vain thing. In section 1 the board of commissioners are "authorized and empowered"—not directed—to issue bonds. Section 8 "authorizes, empowers and directs" them to audit, ascertain and adjust the amount of the floating debt, thus showing that the General Assembly knew when it could add the word "direct" and when it could not. Section 19 places the legislative intention beyond the possibility of doubt by providing: "If the bonds hereby authorized by this act are issued." What is the meaning of this expression if the act were a direct and imperative order that the county should issue the bonds?

That the General Assembly knew and intended a difference between the permissive authority to issue bonds and the imperative "shall" is shown by the use of the latter word, in sections 10 and 11 in providing that the bonds "shall not be issued except at par value"—thus restricting the permission which is given in section 1 to issue bonds. Also in section 4 in providing a form it says the bonds "shall be signed by the chairman"; section 5, "the treasurer shall keep a separate account"; section 6, the "commissioners shall keep an account"; section 15, "the treasurer shall pay the interest"—all these, coupled with the words "bonds hereby authorized," thus meaning clearly what is expressly said in section 19, "if the bonds hereby authorized are issued."

The General Assembly thus knew the difference between "authorizes and empowers" and the words "shall" and "direct" and used each in its appropriate place. It could only "authorize" the debtor to issue the bonds, and did so. It could restrict that authority by imperative requirements as to the methods of doing so and other details and as to those matters used the words "shall" and "direct."

For certain purposes counties and other municipal corporations are governmental, and in those respects being a branch

of the State government, can be changed, or abolished by legislation, and cannot be sued except by legislative permission. *McIlhenny v. Wilmington,* 127 N. C., 149, and cases cited. But as regards indebtedness incurred, they are business corporations, not government, else they could not be sued. Hence the Legislature can neither release the indebtedness nor defer nor order payment—the latter being a judicial function. It belongs neither to the Legislature nor to the judiciary to order bonds to be issued, since neither could order any other debtor to issue bonds. As to indebtedness, the jurisdiction is the same as over other debtors, neither more nor less. The Legislature may "authorize and empower" municipalities to issue bonds and, as we have seen, that is all it has done in this case. It would be a sad and deplorable result if the General Assembly should attempt to order and command in matters affecting a local indebtedness which it cannot command the people of any locality to create. Not having such power, it cannot order the people of any locality to change the form of its indebtedness nor defer its payment to a future day by directing the issue of bonds. It may "empower" them to create an indebtedness, provided (in proper cases) there is a vote of the people to that end. It may authorize the issuing of bonds, it may restrict such permission by imperative provisions as to details and circumstances under which authorization may be used. The courts alone can direct payment. Even the courts cannot order issuance of bonds, for that would be to forbid payment for the duration of the bonds, and might fix a different rate of interest, both in violation of the contract between the parties. When the statute provides "the county commissioners 'may' issue license to sell liquor" the Court has always held that this was discretionary with the commissioners. Even if the word "shall" is used there is a discretion which the courts will not control by *mandamus.*

*Barnes v. Commissioners,* 135 N. C., 27. Yet that is a governmental matter as to which the Legislature could substitute "shall." As to municipal indebtedness the Legislature can neither order payment (which is a judicial power) nor direct the issuance of bonds, which is a matter of agreement between every debtor and his creditor. The time when to be paid, the rate of interest and the like are parts of the contract and cannot be changed, against the will of either party, by legislative enactment.

The only two cases in the books in which any Court has issued a *mandamus* to a municipality to issue bonds are *Commissioners v. People,* 5 Neb., 127, in which the statute provides that said "commissioners are hereby authorized and *required*" to issue said bonds, and *President v. Board,* 45 Ala., 399, in which also the statute "hereby *requires*" that the municipality shall issue the bonds. Neither is authority for such action by the Court when the statute, as in this case, neither "requires" nor "directs" but merely "authorizes and empowers" the county commissioners to issue bonds, and the last-named case is severely criticised by Judge Cooley in his work on Taxation, Vol. 2, p. 1312 (3 Ed.), citing many apposite cases (p. 1307, note) that the State cannot make a contract for a municipality.

The Constitution, Art. VII, sec. 7, provides that "no county, city, town or other municipal corporation shall contract any debt, pledge its faith or loan its credit, nor shall any tax be levied, or collected by any officers of the same, except for the necessary expenses thereof, unless by a vote of the majority of the qualified voters therein." It is true that here there is a debt already contracted, but it is not yet due, and there is certainly no contract that the county shall pay interest thereon for thirty years, a sum largely more than the principal, at a rate not agreed to by the debtor who is debarred by the issue of bonds from paying the principal

at an earlier date. Is it possible that the courts can force any debtor to make a new contract, issuing bonds for a debt not yet due or for script not reduced to judgment, without a vote of the people authorizing such contract? The issue of bonds is a solemn contract. The time and rate of interest are both matters to be agreed upon. The State cannot make a contract for the county, and the expression "authorize and empower" should not be held to effect such end.

Nowhere in the Constitution appears any authority to require or order a county or city to issue bonds. But Article V, sec. 6, restricts taxation levied by county commissioners so that it shall not exceed double the State tax "unless with the special approval of the General Assembly." Here is the source and authority of the numerous acts passed by each Legislature since "authorizing and empowering"— never in any instance directing or requiring—the issue of bonds by counties and the levy of taxes to pay them. The measure must come from the will of the county, the General Assembly giving its approval. Thus speaks the Constitution, recognizing the right of the people of each locality to speak for themselves. So far as the past contract is concerned, the debt already created by the county, with such approval, the courts can enforce its collection. But neither the General Assembly nor the Court can invade the principle of self-government by ordering the county to create a new debt by issuing bonds, to which the county has not given its assent.

Nothing is better settled than that when the courts have construed the meaning of certain words or a phrase, then if the Legislature shall thereafter use those words, it is conclusively presumed that the intention of the Legislature must be taken to be in the import of the words, previously judicially construed—otherwise it would have used other words, of course. Since the phrase "authorized and em-

powered" was construed by this Court to be permissive and
not mandatory (*Jones v. Commissioners*, 135 N. C., 218)
the General Assembly of 1905 has met. If it had been the
intention of that body to make the statute mandatory, it
would have amended the statute by adding appropriate
words to express such intent. On the contrary, the General
Assembly (1905, chap. 132) passed another act upon the
same subject entitled "An act to authorize the Board of
Commissioners of Madison County to issue bonds, etc.," and
in section 1 thereof it is again provided that said board are
hereby "authorized and empowered"—not required nor di-
rected—to issue said bonds. The General Assembly know-
ing the Court had construed those words to be permissive
and not mandatory, and as conferring only the "special
approval of the General Assembly" (Constitution, Art. V,
sec. 6), thus expressed its will that the statute should be per-
missive only. It thus also added the weight of its legislative
construction to that of the Court as to the meaning of the Act
of 1903. It is fair to conclude from the omission to add
mandatory words, that if they were inserted by the drafts-
man, they were stricken out, or at least that the bill could
not have been enacted in a mandatory form. That the Gen-
eral Assembly acted intelligently and with full knowledge
that the statute was not mandatory, is shown by the fact the
same Legislature (1905) passed two other statutes in re-
gard to Madison County which it saw fit to make mandatory,
and used appropriate words to express such intent. In chap-
ter 240 it provided for levying a tax to build an iron bridge
in Madison County. In section 1 of said act the board of
county commissioners are "authorized, empowered and *di-
rected*" to build such bridge and "*shall* levy a tax," etc.
Again by chapter 262 it is provided that said county of
Madison "shall levy a special road tax  *  *  *  to be

137——39

specially applied on the public roads of the county in the purchase of blasting and bridge material." These two acts, requiring the building of public bridges and roads and the levy of taxes for that purpose, were governmental and have been held to be therefore matters within the scope of the legislative authority to *command* to be done. *Tate v. Commissioners,* 122 N. C., 812, cited in *Jones v. Commissioners,* 135 N. C., at pp. 223, 224, where the distinction is drawn.

It is different, however, as to issuing thirty-year bonds, whatever the previous consideration, for that is not imposing a governmental duty and directing the levy of taxes to discharge it, but it would be a legislative requirement that the county make a contract, without its consent, and which yet would be subject to enforcement in the courts.

The General Assembly of 1903 (chapter 289) understood clearly this fundamental distinction between imposing a governmental duty and requiring the county, as a financial agency of its people, to make a contract, and therefore said chapter 289, Laws 1903, merely "authorizes and empowers" the county commissioners to issue new bonds for the former bonds which will not be due till 1907. And the General Assembly of 1905, knowing that this Court had held those words to be permissive and not mandatory, enacted a new statute upon the same subject, using the same words, and presumably only because it had the guarantee of a decision of this Court that the words could not be construed except as permissive authority.

WALKER, J., dissenting. When this case was before us at a former term, my conclusion, after a most careful investigation of the questions involved and a special consideration of the statute under which the plaintiff claims the right to a *mandamus,* was that the Legislature did not intend by that act to compel the commissioners to issue the bonds, but only to invest them with the power and authority to do so, if in

the exercise of their judgment and discretion they thought
it best for the public interests.  A further consideration of
the case leads me to think that the conclusion then reached
by me was correct.  If it were not for the great respect en-
tertained by me for the opinion of my brethren, I would say
that the act admits of no other construction.  Let it be con-
ceded, for the sake of the argument, and it may be a per-
fectly correct proposition, that the Legislature has the un-
doubted power to compel the commissioners to issue bonds
for the purposes mentioned in the statute, and let it be
further granted that where power is given to public officers
in language directory, permissive or enabling, the courts will
construe it to be in effect peremptory, whenever the public
interest or individual rights call for the exercise of the
power, and we are still far from proving that the act under
consideration is mandatory in its terms.  The first of the
two propositions I will not discuss, as I do not deem it at
all necessary for a decision of this case.  When the act is
correctly interpreted, we are able to decide the case before
having reached that question in the proper order of discus-
sion.  It is only necessary to inquire whether the Legislature
has the power to command, when we find that it has under-
taken to exercise that power.  As to the second proposition,
it is a general rule that words in form permissive will be
construed as mandatory when they are used to confer power
or authority, the exercise of which is important for the pro-
tection of public or private rights, or for the advancement
of justice.  This is the general rule, but it does not mean that
the words are to be so construed if a contrary intention ap-
pears, nor does it abrogate, or even impair, the force of the
rule of construction that the entire statute must be consid-
ered in ascertaining the intent, and that the intent as thus
expressed in the context must control in determining the
meaning of the act.  *Justice Story* says for the Court in

*Minor v. Bank,* 1 Peters (U. S.), 46-64: "The argument of the defendants is that 'may' in this section means 'must'; and reliance is placed upon a well known rule in the construction of public statutes, where the word 'may' is often construed as imperative. Without question, such a construction is proper in all cases where the Legislature mean to impose a positive and absolute duty, and not merely to give a discretionary power. But no general rule can be laid down upon this subject, further than that that proposition ought to be adopted in this, as in other cases, which carries into effect the true intent and object of the Legislature in the enactment. The ordinary meaning of the language must be presumed to be intended, unless it would manifestly defeat the object of the provisions." Here is a clear declaration by a Court of the highest authority that the principle contended for has its limitations and has never become crystalized into a hard and fast rule to be applied inexorably, notwithstanding it may defeat the real intention of the Legislature. In my former (concurring) opinion, I reviewed the provisions of the act for the purpose of showing that the Legislature, by the use of the words "are hereby authorized and empowered to issue coupon bonds," intended that they should have their admitted primary and ordinary meaning, leaving the whole matter to the judgment and discretion of the commissioners, and there is good reason for this construction, as the Legislature did not wish to interfere with the administration of local affairs and as there is nothing in the case which tends to show that it was thought the commissioners would not exercise their judgment and discretion honestly and in accordance with their true convictions as to the best interests and requirements of their county, and that coercive measures were therefore necessary to compel them to act in a particular way. If the Legislature did not think so at the time, and as far as appears it had no reason so to think, the

mere fact that the county was burdened with a large indebtedness would be no more reason for compelling the commissioners to issue bonds than for authorizing them to exercise their discretion in doing so. To the county commissioners, says this Court in *Brodnax v. Groom,* 64 N. C., 244, and *Cromartie v. Commissioners,* 87 N. C., 134, is confided "the trust of regulating all county affairs." It is not to be supposed that the Legislature, if it has a supervising and controlling power, will interfere with the local administration, unless there has been a wilful refusal to act on the part of the commissioners.. Such antagonism would be unnecessary and, as *Chief Justice Pearson* says in *Brodnax v. Groom,* such exercise of power would be well-nigh despotic. The commissioners having special knowledge of the facts and being perfectly familiar with the condition of county affairs, are presumed to be more competent to judge correctly as to the expediency of issuing bonds than the Legislature, at least so apparently thought this Court in *Brodnax v. Groom;* and we should not infer that the Legislature intended gratuitously to force them to act. While it is manifestly right and proper that the local authorities should have the power to refund the bonded indebtedness of the county, the usual method of satisfying such debts is by taxation, and this was known or should have been known, by the creditors when they bought the bonds. They are not therefore entitled as of right to have new bonds issued and exchanged for those now held by them no more than a creditor has the right to compel his debtor, who is an individual, to renew his note or other evidence of indebtedness. It is a mere matter of favor to be granted or not as the debtor may determine. In the case of a county it should not be compelled to do so, unless an extreme case is presented for the exercise of the paramount and controlling power of the Legislature, and we should not presume that the Legislature intended to exert its

power in such a way unless that intention clearly appears.
The issue of these bonds will virtually prevent the county
from paying its indebtedness for many years, even though
it may be abundantly able to do so long before their maturity.
This, to be sure, will benefit the bondholders, but may prove
very detrimental to the county, and surely her people should
at least be consulted before any such action is taken.

But I think that the statute, on its face, shows that the
Legislature did not intend to act so inconsiderately in this
matter and to force an issue of bonds regardless of the wishes
of the people of the county or of the local authorities. It
uses words implying permission to issue the bonds and not
words of .command. The suggestion is made that after the
commissioners are thus authorized to issue the bonds, all
other duties necessary to be performed for the purpose of
executing its order are enjoined in peremptory words and
this shows that the duty to issue the bonds was intended to
be mandatory. To my mind, this is a most cogent reason for
construing the words. of the act as merely conferring a dis-
cretionary power. If the board has a discretion and orders
the bonds to be issued, all other duties to be performed, such
as auditing, preparing the bonds, keeping an account, paying
interest, etc., would be ministerial and absolutely required
in the execution of the order of the board, and therefore
mandatory in their nature. When the Legislature intended
to confer a discretionary power, it used language fit for that
purpose, but when it directed the performance of duties
which were necessarily mandatory, because the order of the
board could not otherwise be made effectual, it changed the
form of expression so as to adapt it to the nature of the duties
thus required. It was careful to fit the language to the na-
ture of the authority given or the duty enjoined, so that its
intention might not be misunderstood. The act means no
more than this, that if the board shall decide to issue the

bonds, then the other officers shall perform the duties speci-
fied. If those duties had been made discretionary instead of
compulsory, the decision of the board could be nullified by
a refusal to perform them. I think I am sustained in the
views so far expressed by the case of *Staples v. Bridgeport*,
75 Conn., 509, in which a question similar to the one in this
case is discussed. That the authority to issue the bonds was
merely permissive, is further conclusively shown by the use
in section 19 of the words "if the bonds authorized by this
act are issued." This implies without doubt that the com-
missioners might not see fit, in the exercise of their discre-
tion, to issue them. It seems to me that it can mean nothing
else. It is suggested that these words refer to the inability
of the commissioners to sell or exchange the bonds under the
provisions of sections 10 and 11 of the act. But by force
of the very words employed, the reference is to the authority
to issue and not to the sale or exchange of the bonds. If the
latter had been intended, how easy it would have been to have
said so. The language in such a case would have been "if
the bonds authorized cannot be sold or exchanged." Again,
the act provides (section 10) that the bonds, "when issued,"
shall be placed in the hands of the treasurer of the county
to be sold, so that by the terms of the act, it cannot be deter-
mined whether the bonds will bring their par value or not
until they are issued; and the same may be said in regard to
the exchange of the bonds. It is clearly contemplated that
the issue of the bonds shall precede any attempt to sell them,
as they must be placed in the hands of the treasurer for the
purpose of being sold. Until he has tried the market it can-
not be known what the result will be. It may be further
said, in this connection, that the treasurer is not only directed
to sell the bonds but the commissioners are required by the
act (section 10) to apply the proceeds of sale to the payment,
not only of the old bonds (if they cannot be exchanged for

new ones), but to the discharge of all debts contracted for necessary expenses prior to January, 1903, which is a very large part of the total indebtedness, so that the bonds would have to be issued for the latter purpose anyhow, and the reasoning of the Court so far as it applies to a possible failure to exchange the bonds or to sell them at par must lose its force. All this but shows the clear intention of the Legislature by the use of the words in section 19, "if the bonds authorized by this act are issued," to imply that the commissioners for some reason satisfactory to themselves might decide not to issue the bonds.

It is argued that the commissioners having, at the meeting on April 20, ordered the bonds to be issued, could not revoke that order by the resolution passed in May. If this be a correct proposition, it is strange indeed that the decision is not rested upon that ground, as it would effectually dispose of the case without an elaborate discussion of the other and more serious questions. But it is not correct in law. In *Staples v. Bridgeport, supra,* the precise question was raised and decided contrary to the present contention. It was there held that although the local authorities had voted to issue bonds, it could rescind its action before substantially anything was done or any bonds issued under its vote. If it had appeared in this case, and it does not, that any one has acted to his prejudice upon the vote of the commissioners to issue the bonds, we could only hold that it was his folly so to act when the whole matter was *in fieri* and subject to be revoked. The whole argument presupposes that the order of the commissioners was revocable and, if it was, those who may have relied upon it, knowing of its revocable character, surely cannot complain if the commissioners afterwards exercised their undoubted right to rescind their resolution. They acted with their eyes open and if they have suffered any loss it is the result of their own folly.

Believing that the terms of the act are not mandatory and were not intended to be, I must dissent from the conclusion of the Court.