R. J. BURGIN et al. v. B. F. SMITH.

(Filed 23 December, 1909.)

1. **Necessaries—Courthouse.**

The building and repairing of a courthouse by the county is a part of its necessary expense.

2. **Counties — Quasi Corporations — State Agencies — Legislative Powers—Courthouse—Necessaries—Limitation of Expenditure.**

A county is a *quasi* corporation distinguishable from municipal corporations on the one hand and private corporations aggregate on the other hand. The Legislature has the power to control and govern them as its creatures and political agencies, and a limitation imposed by a special act upon the cost of repairing a courthouse is final, and may not be exceeded by the county authorities.

3. **Counties—Courthouse—Legislative Powers—Necessaries—Limitations—Bond Issues—"County Script."**

The notes or evidences of indebtedness issued by a county is within the meaning of an act authorizing a county to issue "coupon bonds" or "county script" for the purposes of improving the courthouse; and when the act authorizes the issue not to exceed $5,000, a limit to the cost of the improvements is placed in that sum and not merely a limit to the amount of issue of bonds.

4. **Same—Excessive Issue—Void Notes.**

When a special act of the Legislature places a limit upon the amount to be expended by a county in improving its courthouse, authorizing an issue of "coupon bonds" and "county script" not to exceed a certain sum, notes in excess of that amount given by the county for the improvements under an entire contract calling for a larger amount than authorized, are void. *Fawcett v. Mount Airy*, 134 N. C., 15, cited and distinguished.

5. **Same—Special Act—General Powers—Interpretation of Statutes.**

When a special act of the Legislature has imposed a limit upon the expense of a county to be incurred in improving its courthouse, the commissioners cannot avoid the will of the Legislature as therein declared by setting up a general power of contracting debts for necessary expenses, limited only by the constitutional limitation of taxation, and thus under an entire contract made beforehand expend a larger amount for the purpose than that prescribed by the special act.

6. **Counties—Courthouse—Acceptance—Necessaries—Legislative Powers—Limitations—Excess—Estoppel.**

When a limit is placed by the Legislature upon the expenditures of a county in improving its courthouse, and an entire contract is made for the improvements in excess of the amount named, the county authorities, by accepting the work, are not estopped to deny the validity of notes issued and given for the

151—36

excess by the mere fact that the work contracted for has been performed and accepted.

7. **Counties — Courthouse — Acceptance — Necessaries — Legislative Powers—Limitations—Excess—Bond Issues—Payment of Interest—Ratification.**

When a county has issued bonds for the improvement of its courthouse in excess of the amount limited therefor by the Legislature in a special act, the payment of interest by the county on all the bonds does not have the effect of ratifying the bonds issued beyond the lawful limit, for a ratification can have no greater force than, or exceed, a previous authority.

8. **Counties — Courthouse — Necessaries — Limitation of Powers — Excess—Void Notes—Procedure—Cancellation.**

The county having unlawfully issued certain notes in payment for improvements made upon its courthouse in excess of the limit therefor fixed by a special legislative act, and the lower court having erroneously held them valid, the lower court is directed to enter judgment declaring the notes invalid, and ordering the defendant to surrender them to the clerk for cancellation.

9. **Counties—Courthouse—Acceptance—Latent Defects—Contracts, Breach of—Damages—Mala Fides.**

After the owner has accepted a building from his contractor, he must show *mala fides* upon the part of the contractor in inducing his acceptance, in order to recover damages for latent defects alleged not to have been discoverable at the time.

10. **Same—Evidence—Nonsuit.**

In this case the county commissioners contracted with defendant to put additions and improvements upon the courthouse, and by the method prescribed in the contract, accepted the work as entirely satisfactory, without *mala fides* on the contractor's part. In an action against defendant for latent defects, the evidence tended only to show that a certain brick wall was not as high as specified, that there were certain leaks, and that certain concrete work was imperfect. As to the concrete work, it was shown that with the best workmanship and materials it would frequently show later the defects complained of; and that the contractor had offered, without avail, to make the work good. *Held*, that defendant's motion to nonsuit upon the evidence should have been granted.

PLAINTIFFS' APPEAL.

THIS was a civil action, instituted in McDowell County, and, by order of the Superior Court, duly removed for trial to BURKE County, where it was tried before *J. S. Adams, J.,* and a jury, at May Term, 1909. Both parties appealed.

This action was originally begun by R. J. Burgin, on behalf of himself and other taxpayers of McDowell County, against the board of commissioners of said county, the treasurer and sheriff of said county and B. F. Smith, trading as the B. F. Smith Fireproof Construction Company, seeking to enjoin the payment of

certain notes issued by the board of commissioners of said county to B. F. Smith, in the sum of $1,500—three notes of $500—and to enjoin the collection of a special tax levied to raise money to pay the same, the Board of Commissioners of McDowell also brought suit against B. F. Smith, the purpose of this action being to recover judgment for defective work done under the contract, hereinafter more fully recited, for improving and enlarging the courthouse in said county. In the Burgin suit the then board of commissioners (its members having been changed) answered, admitting the allegations of the complaint and praying to be made party plaintiff. This was done, it seems, without objection, and the board of commissioners took a nonsuit in the separate action instituted by it against Smith. The pleadings were reformed to meet this change of parties. In the Burgin suit the restraining order was issued and continued to the hearing of the action. The first draft of the complaint alleged that the Board of Commissioners of McDowell were authorized by chapter 242, Public Laws 1901, to issue coupon bonds or county script, in an amount not exceeding $5,000, for the purpose of improving and enlarging the courthouse in Marion; that in January, 1902, the then board of county commissioners entered into a contract with the defendant, B. F. Smith, trading as the B. F. Smith Fireproof Construction Company, with the plans and specifications thereto attached, for the purposes specified in the act, and agreed to pay the said Smith the sum of $6,500 therefor, to raise which said sum the county agreed to issue and did issue $5,000 in coupon bonds of the county, and county script in the sum of $1,500—three notes of $500 each—payable in five years, with interest at five per cent. per annum. The interest on the bonds was at the rate of six per cent. and payable semiannually, evidenced by coupons attached to the bonds. The contract with Smith bound him "to well and sufficiently provide all necessary material, tools and appliances, and perform all the labor required in the proper construction, erection and completion of a new addition to the county courthouse and appurtenances for said second party (board of commissioners), including metal fixtures and appliances," to be erected, etc., according to plans and specifications on file in the office of the register of deeds of said county. The commissioners reserved the right to make changes or alterations, and the contract provided a way for determining whether the alterations increased or diminished the contract price. The work was to be completed on or before 15 July, 1902. Then the contract proceeds: "In consideration of the foregoing covenants and agreements being well and faith-

fully performed by said first party (Smith), the said second party agrees to pay said first party, or order, the sum of $6,500, as follows: $5,000 in cash and $1,500 in three notes, of $500 each, due and payable in five years from issue, drawing interest at five per cent., the county reserving the right to redeem any or all at any interest-paying period." As the work progressed, it was stipulated that seventy-five per cent. of the value of material furnished for and labor performed in the construction of said building and its appurtenances should be paid on or about the first day of each month, and the remainder upon final completion "of said building and its equipments and appurtenances, as required by said specifications." Smith was required to give bond in the sum of $6,500, and it was further stipulated that "said second party shall appoint a superintendent, or committee, qualified to judge as to the quality and character of the material and work required by this agreement, whose duty it should be to inspect and report upon the work and material during the construction of said building; and should any material be furnished therefor, or work be done thereon, which, in his or their opinion, is not in accordance with the requirements of the plans and specifications therefor, it shall be his or their duty to notify said first party thereof, in person or by written notice"; and the contract then provides the manner of adjusting any difference on this account, including arbitration; and "upon final completion of the work embraced in this agreement, the said second party shall examine the same, and, if completed according to contract, shall immediately accept the same and make final settlement with said first party therefor." It was also stipulated that "this contract covers the work in its entirety," and contained "all the understandings and agreements had between the parties hereto in relation to the erection and completion of said building and its equipments and appurtenances and the payment therefor," etc. The work was completed and accepted on 2 June, 1902, and the board of commissioners on that day gave a statement to Smith, saying that he had executed the contract to the entire satisfaction of the board of commissioners, and the workmanship was first-class and the work was in every respect up to plans and specifications. During the progress of the work, there were some slight changes, but the cost of these was adjusted. On 20 March there arose a controversy as to whether the walls of the building were to be raised eighteen inches, and the board of commissioners requested a settlement of this matter pursuant to the terms of the contract. The defendant satisfied the board that the plans and specifications did not call for this, and the work proceeded. The board

of commissioners, under the provisions of the contract, appointed one Walter Graham as its superintendent of the work; then L. P. Crawford, chairman of the board; then J. G. Neal, a member of the board (who was dead at the time of the trial). The complaint alleged defective work and poor materials; that the walls were not raised to the height required, and that in a short time after the completion of the work the defects began to appear; that the acceptance was procured by the fraudulent devices and circumvention of the defendant, and the defective work so skillfully covered up and concealed that the commissioners could not discover it. The plaintiff further alleged that the three notes of $500 were void, as issued without authority and contrary to the provisions of chapter 242, Public Laws 1901, demanded their surrender and cancellation, and damages in the sum of $1,999.99 for breach of the contract. The defendant denied the allegations of the complaint, claiming that the work and materials were in accordance with the contract, denying any and all fraud, and stating that he had, upon the first notice of defective work, offered to make it good, and requested permission of the board of commissioners to make it good, and that they had refused to permit him to make good the defective work. His Honor submitted issues to the jury, which, with the findings, are as follows:

1. "Did defendant fail to comply with his contract, as alleged in the complaint?"    Answer: "Yes."

2. "Did the defendant, by false and fraudulent representations or by false and fraudulent concealments of latent defects in the construction of the building, induce the board of commissioners to accept and approve the work and make settlement for the same?"    Answer: "Yes."

3. "Does the contract require the old walls of the building to be built higher; and, if so, did the defendant, by false and fraudulent representations to the board of commissioners as to the meaning of the plans and specifications, induce the said board to abandon and waive the right to require the walls to be built higher?"    Answer: "Yes."

4. "Did the board of commissioners exceed the power and authority vested in them by law in executing the notes referred to in the answer?"    Answer: "No."

5. "What damage, if any, have plaintiffs sustained by the fraud of the defendant?"    Answer: "One thousand eight hundred dollars."

6. "Is the plaintiff indebted to the defendant; and, if so, in what amount?"    Answer: "No; for the reason that the notes or

script pleaded as a counterclaim were not due at the beginning of this action."

Upon the verdict his Honor rendered the following judgment: "This cause having been heard before the court and jury, and the jury having found the first, second, third and fifth issues in favor of the plaintiffs, as set out in the record: It is now, on motion of W. T. Morgan, Avery & Ervin and Avery & Avery, counsel for the plaintiffs, considered and adjudged that the plaintiff Board of County Commissioners of McDowell County do recover of the defendant, B. F. Smith, the sum of $1,800, the amount of damages assessed by the jury in response to the fifth issue, with interest on the same from 31 May, 1909, until paid, together with the costs of this action, to be taxed by the clerk of this court; and, further, that the script issued to defendant is valid, and the injunction heretofore issued be dissolved." From which judgment both parties appealed to this Court.

*Avery & Avery, Avery & Ervin* and *W. T. Morgan* for plaintiff.

*Hudgins, Watson & Johnson, Pless & Winborne* and *C. M. Fulton* for defendant.

### PLAINTIFF'S APPEAL.

MANNING, J., after stating the case: The appeal of the plaintiffs presents but two questions, to-wit: (1) Did the Board of Commissioners of McDowell County have the power to exceed the amount authorized by chapter 242, Public Laws 1901, in the improving and enlarging the courthouse in that county? (2) Is the county estopped by acceptance of the benefit of the executed contract to deny its liability?

It is well settled by several decisions of this Court that the building and repairing of the court house in a county is a necessary expense. *Halcombe v. Commissioners,* 89 N. C., 346; *Vaughan v. Commissioners,* 117 N. C., 429; *Black v. Commissioners,* 129 N. C., 121; *Ward v. Commissioners,* 146 N. C., 534. But "counties are but agencies of the State government." *White v. Commissioners,* 90 N. C., 437. They can be created, changed (*Dare v. Currituck,* 95 N. C., 189) or abolished (*Mills v. Williams,* 33 N. C., 558) at the legislative will. They are subject to legislative authority, which can direct them to do, as a duty, all such matters as they can empower them to do. *Harris v. Wright,* 121 N. C., 171; *McCormac v. Commissioners,* 90 N. C., 441; *Tate v. Commissioners,* 122 N. C., 812. In *Jones v. Commissioners,* 137 N. C., 579, this Court said: "These counties are not, strictly speaking, municipal corporations at all, in the ordinary

acceptation of the term. They have many of the features of such corporations, but they are usually termed *quasi* public corporations. In the exercise of ordinary governmental functions, they are simply agencies of the State, constituted for the convenience of local administration, in certain portions of the State's territory, and in the exercise of such functions they are subject to almost unlimited legislative control, except where this power is restricted by constitutional provision." In *White v. Commissioners,* 90 N. C., 437, this Court said: "They are subdivisions of its (State's) territory, embracing the people who inhabit the same, created by the sovereign authority and organized for political and civil purposes. They are created by the sovereign, without any special regard for, or the solicitation, consent or desire of the people who reside in them. . . . They are not, in strict legal sense, municipal corporations; they are sometimes called *quasi* corporations, and this designation distinguishes them on the one hand from private corporations aggregate, and on the other from municipal corporations proper, such as cities and towns, organized under charters and special statutes, and invested with more and special powers, and endowed with more of the functions of corporate life." They may be sued only in such cases and for such causes as may be provided for and allowed by the statute. *Tate v. Commissioners, supra,* was an action to compel by *mandamus* the commissioners of Haywood County to put in force a legislative enactment requiring the county authorities to work their roads by taxation. *Jones v. Commissioners, supra,* was an action to compel by *mandamus* the commissioners of Madison County to obey a legislative act by issuing bonds to pay the existent debts of the county, contracted for necessary expenses. The power of the Legislature to compel the county commissioners to levy taxes to the constitutional limit to pay the necessary expenses of maintaining the county has never been questioned. In *Broadnax v. Groom,* 64 N. C., 244; *Cromartie v. Commissioners,* 87 N. C., 134; *Ward v. Commissioners, supra,* and similar cases, the question involved was the *power of the courts* to interfere with the action of the commissioners, and not the power of the Legislature. In *Hightower v. Raleigh,* 150 N. C., 569, *Mr. Justice Brown,* speaking for this Court, said: "While it is within the province of the courts to determine what are necessary public buildings and what classes of expenditure fall within the definition of the necessary expenses of a municipal corporation, the authority for determining the kind of building that is needed, or what would be a reasonable cost for it, is not within the purview of the judicial au-

thority. It is vested in the Legislature and municipal authority, and not in the courts. *Vaughan v. Commissioners, supra."*

In construing section 7, Article VII, Constitution of North Carolina, this Court, in *Evans v. Commissioners,* 89 N. C., 154, said: "This provision leaves the Legislature free to confer upon municipal organizations the power to create debts and issue public securities in order to raise funds to meet those 'necessary expenses,' when it may be deemed expedient, and the legislation may be made dependent on the result of a popular vote for its efficacy." This power of the Legislature to prescribe the manner of contracting debts, even for necessary expenses, was further elaborated and enforced by this Court in *Wadsworth v. Concord,* 133 N. C., 587, and, when prescribed, is exclusive. Controlled by the doctrine announced in the foregoing decisions of this Court, which has for many years maintained the wise and salutary principle that the legislative department of the government has the power to control and govern the counties of the State as its creatures and political agencies, the conclusion is irresistible that in contracting a debt, even for such a necessary expense as the repairs of a courthouse, the Legislature has the power, if it choose to exercise it, to put a limitation upon the cost. The Legislature did, by act (chapter 242, Laws 1901), limit the Board of Commissioners of McDowell County to $5,000 for the purposes of enlarging and improving the courthouse in McDowell County, and the commissioners had no power, in obeying the act of the Legislature, to exceed the limit prescribed for this expense. In the contract made by the commissioners with the defendant, in the attempt to carry out and obey the act of the Legislature, the commissioners did exceed the limit prescribed by the Legislature, and it appears from the evidence of Smith, the defendant, that he knew of the act and of its limitation. The contract was an entirety; the consideration a "lump sum." Where the Legislature has interposed its will and plainly declared it; where it has by its act prescribed the limit of expenditure, even for a necessary expense for a county, it cannot, under the decisions of this Court herein cited, be maintained that the commissioners can disregard and set at naught the legislative will by setting up a general power of contracting debts for necessary expenses, restrained only by the constitutional limitation of taxation. The fallacy of this contention is that the power to contract debts within the limit of the constitutional limitation of taxation is not without limit. The Legislature of the State—that power which made, at its pleasure, and can unmake at its will, the county itself—can interpose its will; and when it does

so, its will is supreme and must be obeyed. The Legislature has enacted general laws which control, in the absence of particular acts. It is, however, suggested that the act under consideration limited the issue of bonds, and not the cost of the improvement of the courthouse, but this construction of the act is too narrow. It is manifest that it was contemplated that the proposed enlargement of the courthouse would not cost more than $5,000, and the Legislature placed this limit upon it, "not exceeding the sum of $5,000," and authorized the commissioners "to issue coupon bonds or county script." By "county script" is meant notes or evidences of debt, other than "coupon bonds." It is also contended that *Fawcett v. Mt. Airy,* 134 N. C., 125, is decisive of this case. We do not think so. That case is distinguishable from the present case upon its facts. In that case the town of Mt. Airy issued bonds to the amount of the legislative limit, $50,000 (Private Laws 1901, ch. 216, sec. 1), and expended the proceeds for the purposes authorized by the act. The town authorities did not attempt to issue any more bonds or incur any larger debt under the act, but after it had expended the $50,000 it was discovered that that sum was insufficient to complete the sewerage system and lighting plant authorized by the act, and the town then undertook to issue other notes to complete the plants. In this case the original contract was for $6,500—$1,500 in excess of the legislative limit. The contract was by express limitation an entire contract. In the *Fawcett case,* the main if not the only question considered by this Court was whether the building of a lighting plant and sewerage system was "a necessary expense," and this was clearly the only point considered. Over towns the power of the Legislature is more restricted (*Jones v. Commissioners,* 137 N. C., 579); but even as to these municipal corporations this Court, in *Wharton v. Greensboro,* 146 N. C., 356, said: "There can be no doubt that the General Assembly may thus restrict (section 2977, Revisal) the powers of municipal corporations to contract debts. They are but instrumentalities of the State for the administration of local government, and their power may be enlarged, abridged or withdrawn entirely, at the pleasure of the Legislature. *Lilly v. Taylor,* 88 N. C., 490; *Jones v. Commissioners,* 137 N. C., 592."

The only other question that remains for consideration is: Can the county commissioners avail themselves of their want of power to contract the debt in excess of $5,000, as the work has been performed, accepted and notes issued for $1,500 in payment of the excess contract price over $5,000? We think the defense is available to the county commissioners, and we do not think

they are estopped by the fact that the work contracted for has been performed and accepted and notes in payment therefor issued, to deny their validity. In *Davies v. Dickinson,* 117 U. S., 657, *Mr. Justice Gray* said: "The county court has no power to subscribe for stock in the railroad corporation, or to issue bonds therefor, except as authorized *by statute.* The statute authorized the county court to subscribe for such amount of stock only as should be fixed and proposed by the commissioners named in the statute and be approved by a vote of the majority of the voters of the county; and the authority of the county court either to levy taxes or to issue bonds was limited to the amount so proposed and voted. That amount was $250,000. The county court therefore had no authority to issue bonds for a greater amount, and any bonds issued in excess of that amount were unlawful and void." Nor can the payment of interest on all the bonds have the effect of ratifying bonds issued beyond the lawful limit, for a ratification can have no greater force than a previous authority, and the county cannot ratify what it could not have authorized. *Marsh v. Fulton,* 10 Wall., 676. See authorities cited, 11 Rose's Notes, 131; *Commissioners v. Call,* 123 N. C., 308; *Commissioners v. Payne,* 123 N. C., 432; *Debnam v. Chitty,* 131 N. C., 657. In *Bank v. South Hadley,* 128 Mass., 503, it is held that "If a town treasurer borrows money in a manner unauthorized by statute, the lender cannot maintain an action against the town to recover it back, although the money is used by the treasurer in payment of debts of the town." The court further said: "It is sometimes said, indeed, with reference to money borrowed in disregard of positive prohibition, when both parties are in fault, that it cannot under any circumstances be recovered back, because that would be to defeat the prohibition in favor of a guilty party. *McDonald v. Mayor,* 68 N. Y., 23." In the *McDonald case,* cited *supra,* similar to the present case, the New York Court said: "It is plain that if the restriction put upon municipalities by the Legislature for the purposes of reducing and limiting the incurring of debt and the expenditure of the public money may be removed, upon the doctrine now contended for (receipt of benefit), there is no legislative remedy for the evils of municipal government." *Thomas v. Port Huron,* 27 Mich., 320; *Snyder v. Mt. Pulaski,* 176 Ill., 397; *Murphy v. Louisville,* 9 Bush (Ky.), 189; 4 Thomp. Corp., sec. 5262; 2 Herman on Estoppel, sec. 1224:

The defendant, in his testimony, stated that he knew of the act of the Legislature, and that the amount was limited to $5,000. The principle announced in *Trustees v. Realty Co.,* 134 N. C., 41,

BURGIN v. SMITH.

to-wit, "Where a corporation is a party to an executed contract and has received the benefit therefrom, it is estopped from pleading that the contract was *ultra vires*," does not apply to counties, towns or cities, where they have exceeded the legislative limit in contracting the debt sought to be recovered.

For the reasons given, and under the authorities cited, we are of the opinion that the three notes, of $500 each, issued to the defendant by the Board of Commissioners of McDowell County are invalid and unenforcible, and his Honor's judgment declaring them valid is erroneous. The Superior Court of Burke County will enter judgment declaring the notes invalid and ordering the defendant to surrender them to the clerk of said court, who will cancel them.

In the plaintiff's appeal the judgment is

Reversed.

### DEFENDANT'S APPEAL.

MANNING, J. The commissioners of McDowell County, desiring to improve and enlarge the county courthouse, advertised for plans. The defendant, Smith, went to Marion, discussed the matter with the commissioners, and was directed by them to prepare plans and specifications for additions and improvements, the agreement being that if his plans were accepted and he became a bidder for the work and secured it, he would charge nothing for preparing the plans and specifications; but if they were accepted and another secured the work, he was to be compensated in an agreed way for them. Smith prepared the plans and specifications and sent them to the commissioners several weeks before the contract for the work was let. The commissioners accepted Smith's plans; the commissioners advertised for sealed bids, to be filed on or before 20 January, 1902. Smith, with two others, became bidders. Smith's bid was accepted, and contract with him was made on 20 January. Smith lived in Washington City, and it was not contemplated that he should give the performance of the contract his personal attention, but, of course, should have a competent person or superintendent. The plaintiffs alleged that Smith was a man of skill and ability in his business, both as a draftsman and a builder.

It was stipulated by the contract, among other things, as follows: "Said second party shall appoint a superintendent or committee, qualified to judge as to the quality and character of the material and work required by this agreement, whose duty it shall be to inspect and report upon the work and material during the construction of the said building; and should any material be

furnished therefor or work done thereon which in his or their opinion is not in accordance with the requirements of the plans and specifications therefor, it shall be his or their duty to notify said first party (the defendant in this action) thereof, in person or by written notice, forwarded by registered mail to its proper address, unless he or they and said first party or its agent or subcontractor can agree upon the subject in controversy; and the part of the work affected by such notice shall cease and not be resumed until an agreement is reached upon the subject in controversy or settled by competent authority." The commissioners, in compliance with this provision, appointed as their superintendent one J. G. Neal, a man, according to all the evidence, of high character, successful as a business man, and who had been sheriff of the county for many years. He was daily at the work and sometimes oftener. He had absolutely unrestricted opportunity to inspect all material and all work. Not a single witness testifies that any of the work or materials were attempted to be concealed from his inspection, or that anything was done to divert his inspection. The defendant was present only once while the work was being done. A controversy arose about increasing the height of the walls eighteen inches; Smith was notified, as required by the contract, came to Marion, and he and the commissioners discussed the matter, and it was agreed by them that the building should be completed without raising the walls. The work then progressed to completion. On 2 June the work was completed, inspected and accepted, the commissioners accepting it, in writing, "as executed to the entire satisfaction of the commissioners, as meeting all their requirements, and that the workmanship and finish are first-class, being in every respect up to plans and specifications." Smith was not even present. No witness testified that anything was done or said by Smith's superintendent to prevent the fullest and most minute inspection by the commissioners. The commissioners then settled with Smith in full, giving the three notes considered in plaintiff's appeal. Defects began to appear in the concrete work soon after the work was accepted, the witnesses differing somewhat in their recollection of the time, and the roof began to leak in a few places. No notice or complaint was made to Smith. After this action was begun by Dr. Burgin, Smith heard of it from his attorney, and at once wrote, complaining of this conduct, requesting information about the defects (in the meantime a new board of commissioners had been elected and come into office) and offering to repair any defects that were reasonably chargeable to bad work, but called attention to the provision of the contract above noted.

He sent a man to Marion, not receiving any reply to his letter, and he offered to repair the work, but the commissioners refused to let Smith do it. The commissioners did nothing to remedy the defects; they did not paint the metal roof, though their own witnesses stated it ought to be painted at least once in three years. That the roof leaks and that some of the cement work is very defective was proved beyond doubt. The defendant, Smith, testified himself that he went to Marion during the trial of this action—seven years after the work was done—and that some of the concrete work was bad. The witnesses for the plaintiff and the defendant seemed to agree that it was rarely practicable to make every job of concrete work good; that the most expert and capable man occasionally. failed. We have carefully read and examined the entire evidence taken by a stenographer, and we do not find any evidence legally sufficient to justify the finding of the jury to the second and third issues, and his Honor ought to have instructed the jury to answer those issues "No." The mere development of defects is not sufficient.

In 3 Page on Contracts, sec. 1507, this learned. writer says: "If the person for whom work is done inspects it as it progresses, and accepts it, after such inspection, as full performance of the contract, he cannot recover damages for alleged breach which such inspection *could* have disclosed." There is no doubt that a proper inspection could have disclosed that the walls had not been raised eighteen inches, and that anchors had not been put in the walls, and that the roof leaked, and that the seams of the shingles were not straight. The plaintiff had witnesses who discovered these defects by inspections made by them. It is manifest that the stucco of the columns on the front porch could have been inspected and it could have been discovered whether the stucco was of lime or cement mortar. The character of the plastering in the old part of the building could have been discovered, because the men who did the work lived in Marion and were at the courthouse every work day for several months, and testified at the trial. It would have been impracticable to have discovered whether the cement concrete would be a good job or a bad job, but the commissioners were not required to accept this until they had become satisfied about it. In *Pauly v. Hemphill County,* 62 Fed., 698, a contract containing a stipulation in very nearly the exact words of the stipulation in the present case was considered by the court in the following language: "The proviso in the contract which placed it within the power of the defendant county to select its own commissioner to act as inspector during the building, if honestly carried out in accordance with its terms,

would necessarily have been of the greatest assistance and protection to both of the contracting parties, and would appear to be a wise and prudent precaution in the completion of such work, the actual supervision of which must necessarily be delegated to the representatives of each party. By it every opportunity in reason was given for the defendant (the plaintiff here) to secure good material and work. The plaintiff (defendant here) would at the same time be protected from the faults and negligence of its own servants, by being immediately informed of and enabled to correct them; also from any complaints that might be made subsequently, too late to determine their truth or falsity. The action of such an arbiter or supervisor, in the absence of any complaint made at the time and in the manner provided by the contract, is *prima facie* evidence of compliance with the contract, and should be conclusive, except upon clear and distinct proof of fraud." *Railroad v. March,* 114 U. S., 1035; *Kihlberg v. United States,* 97 U. S., 398; *Sweeney v. United States,* 109 U. S., 618. In *Railway v. Gordon,* 151 U. S., 285, this language is used: "It is difficult to see what effect should be given the acceptance of the work by the superintendent, if not to foreclose the parties from thereafter claiming that the contract had not been performed according to its terms." *Church v. Brose,* 104 Ill., 206; *Railroad v. Price,* 138 U. S., 185; *Koof v. Lull,* 70 Ill., 420. The latent defects, in order to preclude the owner from being concluded by an acceptance based upon such supervision as is stipulated in this contract, must be of such character as indicates *mala fides* on the part of the contractor. The evidence of the plaintiff not only failed to show *mala fides,* but showed that the defects appearing in the work of the defendant were consistent with honest dealing and occurred at times in work done by the most capable and honest contractors. We therefore are of the opinion that his Honor should have sustained defendant's motion of nonsuit on the cause of action stated in the complaint for damages for breach of contract, and in refusing to do so there is error, and the judgment against defendant on this cause of action is

Reversed.